[No. B217683. Second Dist., Div. Two. Sept. 1, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR MANUEL MENDEZ et al., Defendants and Appellants.

## COUNSEL

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant Victor Mendez.

Linda Acaldo, under appointment by the Court of Appeal, for Defendant and Appellant Luis Enrique Ramos.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson, Scott A. Taryle and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DOI TODD, J.**—Appellants Victor Manuel Mendez and Luis Enrique Ramos, juveniles who were tried as adults, appeal from judgments entered following a jury trial that resulted in their convictions of one count of carjacking (Pen. Code, § 215, subd. (a)),[1] one count of assault with a firearm (§ 245, subd. (a)(2)), and seven counts of second degree robbery (§ 211), including criminal street gang and firearm enhancements on each count (§§ 186.22, subd. (b)(1)(C), 12022, subd. (a)(1), 1203.06, subd. (a)(1), 12022.5, subd. (a), and 12022.53, subds. (b) & (e)(1)). Mendez was age 16 at the time he committed the crimes. He was sentenced to state prison for 84 years to life. Ramos, who was one year younger, was sentenced to state prison for 48 years eight months.

---

[1] All statutory references shall be to the Penal Code, unless otherwise noted.

In response to appellants' contentions, we find sufficient evidence supports the jury's findings on the gang enhancements and that Mendez personally used a firearm; that the criminal conviction assessments were properly imposed; and that there are typographical errors in Mendez's abstract of judgment that must be corrected. We · also find that Mendez's lengthy sentence—which was imposed on a juvenile who did not commit a homicide or inflict bodily injury and which makes him ineligible for parole until well beyond his life expectancy—constitutes cruel and unusual punishment and is therefore unconstitutional under the federal and state Constitutions. We remand Mendez's case for reconsideration of his sentence, and direct the trial court to correct his abstract of judgment. In all other respects, the judgments are affirmed.

## FACTS

*Prosecution Case*

### A. *The Crimes*

On June 30, 2007, at approximately 11:40 p.m., Jose Garcia was stopped at an intersection in Palmdale in his green Chevrolet Lumina when a white car with appellants and at least two other people pulled alongside him. Appellants got out and approached Garcia, and one of them asked him if he was "from anywhere." Understanding the question to refer to gang membership, Garcia answered "no." Either appellants or the people in the car said "Blythe Street" several times. Mendez had a gun and opened Garcia's car door, while Ramos stood behind him. Garcia got out of his car and appellants got in and drove away. Garcia's watch was in his car. He walked to a nearby friend's house, and his friend called the police.

About an hour later, at 1:00 a.m. on July 1, 2007, Eduardo Bernal was walking home from work in Los Angeles when two people ran toward him, grabbed him, and told him to empty his pockets. One of the assailants was Ramos, who had his hand under his shirt as though he had a weapon. After Bernal handed over his cell phone, wallet and a compact disc holder, Ramos and the other man ran across the street. Bernal did not call the police, but he did call the bank to report that his credit cards had been stolen.

Approximately 15 minutes later, friends Ethan Shapiro, Curtis Doyal, David Guster, Robert Reber and Daniel Hart were at an intersection in Los Angeles when Garcia's green Chevrolet Lumina passed them slowly, made a U-turn and pulled over to the curb. Appellants and one other person got out of the car and approached the group. Guster testified that when "they pulled up, they were, like, gangsters; and they told me what do I got, and I said, 'I

don't bang.' " Appellants demanded the friends' belongings. When Doyal asked why he should hand anything over, Ramos replied that he had a gun. Doyal challenged him to prove it, and Ramos took the gun from Mendez and pointed it at Doyal's head and Guster's face. Doyal, Guster and Shapiro gave up their wallets, while Reber handed over some change.[2]

Ramos began walking back to the car, then returned to Doyal, called him a "clown," and struck him in the head with the gun. Appellants returned to the car and drove away. Shapiro called 911, and Doyal was taken to the hospital, where he received stitches above his left eyebrow.

About 20 minutes later at 1:35 a.m., Sima Bislamyan was sitting on a curb near her car in North Hollywood with her husband, Arthur Sogoyan. A green Chevrolet Lumina stopped nearby and a man got out with a gun in his hands while three or four other people remained in the car. A few seconds later, a second man got out. The first man pointed a gun at Sogoyan's head, took the cell phone from Bislamyan's hand, pushed her against her car, and threatened to shoot her if she did not "shut up." After Sogoyan handed his wallet to the assailant, the two men got back into the car and drove away.

Sogoyan got into his car and began to follow the green Lumina. His wife tried to follow him in her car, but lost sight of him. At some point, the people in the Lumina realized that Sogoyan was following them. The car made a U-turn and got behind Sogoyan's car. Sogoyan spotted a police vehicle and flagged it down, told the two police officers in the car what had occurred, and pointed to the nearby Lumina. The officers made a U-turn and began following the Lumina, which contained four Hispanic males.

The Lumina accelerated, made a left turn, and immediately collided with a parked vehicle. Ramos exited the driver's door of the Lumina, dropped a gun, and ran away. Two other occupants of the car, including Mendez, also ran away. A fourth person, Guillermo Torres, remained in the car and was taken into custody. A loaded .38-caliber revolver was found under the Lumina.

Two other police officers responded as backup and were maintaining a perimeter around the crash site when they saw Ramos walking toward them wearing a black T-shirt and blue jeans. He was "sweating" and "out of breath." The officers detained him, and noticed that he had a "huge tattoo on the back of his head" that said "B.S.T." One of the officers asked Ramos about the tattoo, and Ramos admitted that he was a Blythe Street gang member with the moniker "Vago."

Meanwhile, other officers were conducting a canine search of the area. The dog had been trained to locate humans based on a "fear scent." The dog

---

[2] Daniel Hart backed away and remained unseen.

followed a scent to the rear of a house, where Mendez was found hiding in a shed, stuck in a pile of tires. The dog bit Mendez, who was then taken into custody. A baseball cap was found in the tires.[3]

## B. *The Investigation*

A couple of hours later, Bislamyan was taken to the crash site, where she identified appellants, and stated that Mendez was the person with the gun. Sogoyan was separately taken to the site, where he identified Ramos as the person who had robbed him, immediately stating, "That's him. That's him." At trial, Sogoyan testified that the person who took his wallet was not the one who used the gun, and the person with the gun was wearing a white shirt. When detained, Mendez was wearing a white shirt.

On July 2, 2007, the day after the crimes had been committed, several victims were shown photographic lineups (six-packs) containing pictures of Mendez and Ramos. Garcia identified Mendez as the person who took his car at gunpoint. Bernal saw a picture that looked similar to Ramos, but did not identify anyone. Shapiro identified Ramos as the person with the gun, and Doyal identified Ramos as the person who assaulted him. Neither Reber nor Guster was able to identify anyone with certainty. Hart identified Mendez as "one of the guys that came out of the car," but not necessarily as the one with the gun.

The Lumina contained Sogoyan's and Doyal's wallets; currency; identification cards belonging to Shapiro, Guster and Doyal; Bernal's cell phone; and a T-shirt similar to the one Ramos had been wearing when he confronted Bernal. Garcia's watch was eventually recovered from the property of Guillermo Torres that was taken into evidence when he was booked at the Sylmar Juvenile Hall. Mendez's palm print was found on a Memorex plastic case found on the front floor of the Lumina, and his fingerprints were found on the inside and outside of the driver's side window. Ramos's prints were not recovered.

## C. *Gang Expert Testimony*

Officer Anthony Smith of the Los Angeles Police Department (LAPD) testified as a gang expert. Officer Smith had been an officer with the LAPD for approximately 12 years, and was assigned to the violent crimes unit. He had previously worked with the FBI on major prison gangs, and held a five-year position in the Van Nuys Gang Unit, where he was assigned to

---

[3] The third person who ran from the scene was also taken into custody, but was later released after the police eliminated him as a suspect.

monitor the Blythe Street gang, which he identified as "one of the largest gangs here in [the] Van Nuys division." He has taught courses on Hispanic street gangs at various law enforcement agencies, and this was the fiftieth case in which he was testifying as a gang expert.

Officer Smith testified that some of the reasons gang members commit violent crimes include (1) enhancing their status within the gang, (2) instilling fear in the community so that nongang persons will not report the crimes to the police, and (3) because nongang persons are easy targets. He also testified that respect is an important part of gang culture, and a sign of disrespect is "bad" because it is considered a form of weakness. If a gang member is considered weak, he could become the victim of a violent crime, and he would have to commit a violent act to gain back respect.

While gang members sometimes commit crimes in their own territory, they often go outside their territory to commit crimes. In general, gang crimes are committed by two or more members because "there's strength in numbers," and one person can act as a "backup," "lookout," or getaway driver. Though gang members sometimes commit offenses without stating their gang names, "most of the time" they state their gang name when committing crimes. Gang members often wear "multiple layers of clothing" when committing crimes, and then "switch clothing" to impair eyewitness identification.

According to Officer Smith, the Blythe Street gang has more than 200 documented members, and is an "entrenched" and "territorial" gang that was started in the 1970's. The gang's territory is in the area of Panorama City. The Blythe Street gang is "turf-oriented," and members identify themselves by a hand sign, usually involving a "C" and "B" for "Calle Blythe." Blythe Street gang members also have "Blythe Street" tattoos, as well as "P" or "P.C." tattoos representing Panorama City. They often wear Boston baseball caps with a "B" and blue or dark clothing. The gang's crimes tend to include gun possession, narcotics offenses, and robberies. Officer Smith testified about prior convictions suffered by Blythe Street gang members, including narcotics possession, assaults, and robberies.

Officer Smith first met Mendez when Mendez was 11 or 12 years old. Mendez was one of the youngest gang members Officer Smith had documented. Mendez's older brother was also a member of the Blythe Street gang. Officer Smith documented Mendez as a "full-fledged, active" member of the Blythe Street gang. When Officer Smith took Mendez's photograph at the time he documented him, Mendez admitted that he was a member of the Blythe Street gang, and he was wearing a "Boston" baseball cap at the time. Mendez has several tattoos indicating his membership in the gang, including "B.S.T." on his elbow and hands, "Blythe Street" on the back of his neck,

"B" on one side of his wrist and an "S.T." on the other side, and the beginning of either a "B" or "P" on his shoulder.

Officer Smith testified that Ramos is also an active, documented member of the Blythe Street gang. Like Mendez, Ramos has several gang tattoos, including a "very large 'B.S.T' on the back of his head," "Blythe Street" in "very large letters" on his right arm, and a "B" on his wrist. Nongang members would not have such tattoos, and would likely be assaulted if they did.

Officer Smith researched Guillermo Torres, the person who remained in the Lumina, and Juan Alvarado, whose fingerprints were found on a calendar in the Lumina and on the driver's side window. Officer Smith discovered that they were also active, documented members of the Blythe Street gang. None of the victims were documented gang members.

When asked a hypothetical question based on the facts of the case, Officer Smith opined that all of the crimes were committed for the benefit of the Blythe Street gang because the crimes "enhance[d]" and "promote[d]" the gang. He based his opinion on the following: the way the crimes were committed; the number of crimes committed in "a small amount of time"; the announcement of the gang's name; his knowledge that Blythe Street gang members "commit robberies to fuel the gang" (he opined "That's how this gang has been around so long. They will commit acts like that for money. . . . That's how they do such things as buy guns for the gang."); the type of revolver used in the crimes was one that was often used by Blythe Street gang members because it was small, easy to conceal, and did not leave behind shell casings; the switching of clothing, which he has seen before with the Blythe Street gang; and one of the prior crimes he investigated involving a Blythe Street gang member was very similar, involving a robbery with multiple gang members attacking a victim and acting as lookouts.

*Defense Case*

No witnesses were called on behalf of the defense. The parties stipulated that Ramos was born on February 22, 1992.[4]

---

[4] Mendez's probation report states that he was born on September 2, 1990.

## DISCUSSION

### I. *Sufficiency of Evidence to Support Gang Allegations.*

Appellants contend there was insufficient evidence to support the gang allegations on each count. They argue that the prosecution primarily relied on the gang expert's opinion, which was not based on any supporting foundational facts.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].) We resolve all conflicts in the evidence and questions of credibility in favor of the verdict, and indulge every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358 [43 Cal.Rptr.2d 135].) This standard applies whether direct or circumstantial evidence is involved. (*People v. Catlin* (2001) 26 Cal.4th 81, 139 [109 Cal.Rptr.2d 31, 26 P.3d 357].) It also applies when determining whether the evidence is sufficient to sustain a jury finding on a gang enhancement. (See *People v. Duran* (2002) 97 Cal.App.4th 1448, 1456–1457 [119 Cal.Rptr.2d 272]; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 321–322 [51 Cal.Rptr.3d 678].) Reversal is unwarranted unless ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin, supra,* at p. 331.)

The gang enhancement in section 186.22, subdivision (b)(1), imposes additional punishment when a defendant commits a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047 [16 Cal.Rptr.3d 880, 94 P.3d 1080].) It applies when a crime is gang related. (*People v. Castenada* (2000) 23 Cal.4th 743, 745 [97 Cal.Rptr.2d 906, 3 P.3d 278].)

Here, there was substantial evidence to support the jury's true findings on the gang allegations. The evidence was undisputed that appellants were active, documented members of the Blythe Street gang, and that they were accompanied during their crime spree by at least two other Blythe Street gang members. Appellants do not claim that they were unaware of each other's membership in the same gang, nor could they, given the obvious Blythe Street tattoos each had. The evidence showed that during the carjacking, the first offense of the night, appellants asked the victim, Garcia, if he was from

anywhere. Garcia testified that he understood this to mean that he was being asked if he belonged to a gang. More than once during the carjacking, appellants or the people accompanying them announced the gang's name. A jury could reasonably infer that the carjacking was committed for the benefit of and in association with a criminal street gang with the intent to promote, further, or assist in criminal conduct by gang members, and that the robberies which immediately followed were committed for the same reasons and with the same intent. This inference is also supported by the evidence that one of the robbery victims, Guster, stated, "I don't bang," believing that appellants and their associates were gang members. The jury could also infer that Ramos returned to Doyal and pistol-whipped him after he challenged Ramos so that Ramos would not appear weak in front of his fellow gang members.

 Based on this evidence, Officer Smith, the gang expert, testified that the crimes were committed to benefit the Blythe Street gang and to "enhance" and "promote" the gang. "[A]n expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713].) Officer Smith based his opinion on the facts of the case—the announcement of the gang's name in connection with at least the first offense, which would instill fear in the victim; that several robberies took place in a short amount of time with multiple gang members who could be used for protection, as lookouts and/or getaway drivers; that robberies were commonly committed by Blythe Street gang members "to fuel the gang," i.e., to obtain money to buy guns for the gang; the type of revolver used in the crimes was one that was often used by Blythe Street gang members because it was small, easy to conceal, and did not leave behind shell casings; the switching of clothing; and the fact that the robberies were very similar in manner to a prior robbery Officer Smith had investigated involving a Blythe Street gang member. In addition, Officer Smith's testimony lent credence to the inference that the assault on Doyal was done to benefit and promote the gang, because weakness or disrespect is a serious negative characteristic in gang culture.

 Contrary to appellants' claim, Officer Smith's testimony was supported by a sufficient evidentiary foundation, and was bolstered by the fact that appellants each acted with other known gang members in committing their crime spree. (*People v. Villalobos, supra*, 145 Cal.App.4th at p. 322 ["Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime."]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198–1199 [5 Cal.Rptr.3d 615] [intent to commit robbery in association with other known gang members supported an inference of intent to assist criminal conduct by

fellow gang members]; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 353–354 [100 Cal.Rptr.3d 351] ["[I]f substantial evidence establishes that the defendant is a gang member who intended to commit the charged felony in association with other gang members, the jury may fairly infer that the defendant also intended for his crime to promote, further or assist criminal conduct by those gang members."]; see also *People v. Leon* (2008) 161 Cal.App.4th 149, 163 [73 Cal.Rptr.3d 786]; *People v. Romero* (2006) 140 Cal.App.4th 15, 19–20 [43 Cal.Rptr.3d 862].)

Reviewing the record in the light most favorable to the judgment, we are satisfied that substantial evidence supports the jury's true findings on the gang allegations.

II. *Sufficiency of Evidence to Support Personal Use of a Firearm, and Effect of Prosecutor's Legal Theory.*

Mendez contends there was insufficient evidence to support the jury's findings as to the robberies of Reber and Guster that he personally used a firearm within the meaning of section 12022.53, subdivision (b).[5] Mendez also contends that the prosecutor proceeded on an incorrect theory of law with respect to the personal use of a firearm enhancement. We disagree.

With respect to sufficiency of the evidence, it is true that neither Reber nor Guster identified Mendez in court as the assailant who approached them with a gun.[6] But the evidence clearly showed that both appellants were involved in the robberies of Reber and his friends. Shapiro testified that Mendez was the one who approached Reber. And at some point during these robberies, Mendez had the gun because Ramos took it from him to pistol-whip Doyal. Guster testified that the person who approached him with the gun was wearing a baseball cap and black shorts. The evidence showed that Mendez was wearing black shorts when the police officers saw him flee from the scene, and a baseball cap was recovered in the shed where Mendez was detained. Mendez's personal use of a weapon was further substantiated by Guster's testimony that he believed the person who held a gun to him was different than the person who pistol-whipped Doyal, identified by witnesses as Ramos.

---

[5] Section 12022.53, subdivision (b) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply."

[6] Reber testified that he could not recall either of the people who approached him that night, and he did not identify anyone in the six-packs. Guster testified that Ramos looked "pretty familiar" as one of the people who got out of the car, and he was also unable to identify anyone from the six-packs.

In light of this evidence, Reber's and Guster's failure to positively identify Mendez in court was not fatal. Weaknesses in the testimony of eyewitnesses are to be evaluated by the jury. (*People v. Elwood* (1988) 199 Cal.App.3d 1365, 1372 [245 Cal.Rptr. 585].) A jury's finding will not be reversed unless it is clearly shown that under no hypothesis is there sufficient evidence to support it. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329 [70 Cal.Rptr.3d 680].) As long as substantial evidence supports the jury's finding, the possibility that the jury could reasonably have reached a different conclusion does not justify reversal. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 564 [59 Cal.Rptr.3d 876]; *People v. Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159].)

We are satisfied that substantial evidence supports the jury's true findings on the section 12022.53, subdivision (b) allegations that Mendez personally used a firearm in the robberies of Reber and Guster.

As to Mendez's second contention, he argues that the jury's findings on the gun allegations in these counts cannot stand against him because the prosecutor proceeded on an incorrect theory of law when she indicated during closing argument that all of the gun allegations should be found true no matter who used a firearm. When a prosecutor relies on alternate theories, some of which are legally correct and others which are legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand. (*People v. Morales* (2001) 25 Cal.4th 34, 43 [104 Cal.Rptr.2d 582, 18 P.3d 11]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1122 [17 Cal.Rptr.2d 365, 847 P.2d 45].)

The prosecutor stated in her closing argument: "There is an instruction, and it's [CALCRIM No.] 1402, and it's a bonus instruction. It's a gang-related firearm enhancement instruction. . . . So, what this means is that if you . . . believe that these defendants committed these crimes to promote Blythe Street gang, okay, and you believe that someone who directly committed these crimes personally used a firearm during each of these crimes—doesn't even need to be these defendants. Just that someone used the gun during the crime—you mark 'true' for all the gun allegations. This is 1402, and it's very important." In rebuttal, the prosecutor stated: "For each crime, if you think that a gun was used, whether personally or by an aiding and abetting theory, then you just mark 'true' for all of the gun allegations."

While it does appear that the prosecutor proceeded on a legally incorrect theory by urging the jury to find true the personal use of firearm allegations no matter who actually used the firearm, the record indicates that in reaching its verdict the jury in fact relied on a correct legal theory. In the robberies against Reber and Guster, the jury was asked to find whether Mendez

personally used a firearm within the meaning of section 12022.53, subdivision (b). The jury was properly instructed, pursuant to CALCRIM No. 3146, that to make this finding it had to find that Mendez *personally* used a firearm. The prosecutor's remarks referred instead to CALCRIM No. 1402, which instructs a jury on what the prosecutor must prove for the jury to find that a *principal* used a firearm. It appears that the jury followed these instructions when deciding the firearm allegations. This is demonstrated by the fact that in the robbery of Bernal, the jury found to be false the allegations that a principal used a firearm, based on the testimony of Bernal that he never actually saw a gun. With respect to the assault with a firearm on Doyal, the jury was asked only to find whether Ramos personally used a firearm. The jury was not asked to make any firearm finding on this count with respect to Mendez because there was no evidence that Mendez assaulted Doyal with a firearm. We are satisfied that the jury understood the difference between the firearm allegations referring to use of a firearm by a principal versus firearm allegations referring to personal use by the specified defendant. We therefore find no basis for reversal.

## III. *Assessments.*

Pursuant to Government Code section 70373, the trial court imposed a $270 criminal conviction assessment on Mendez ($30 for each of nine counts) and a $300 assessment on Ramos ($30 for each of 10 counts).[7] Appellants committed their offenses in July 2007, and were convicted on April 24, 2009, when the jury returned its guilty verdicts.

█ Government Code section 70373, subdivision (a)(1), provides that "[t]o ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense" in the amount of $30 for each misdemeanor or felony. The statute became effective January 1, 2009, and was enacted as " 'one component of a broader legislative scheme in which filing fees in civil, family, and probate cases were also raised.' " (*People v. Castillo* (2010) 182 Cal.App.4th 1410, 1413 [106 Cal.Rptr.3d 688].) Appellants contend that because their crimes occurred prior to the effective date of the statute, it cannot be applied retroactively. The People counter that the assessments were properly imposed because appellants' convictions occurred after the effective date of the statute.

Although the parties spend a fair amount of time arguing this issue, as Mendez notes in his reply brief, following the filing of appellants' opening briefs in this case, our colleagues in the Third Appellate District held that the

---

[7] Prior to trial, Ramos pled no contest to a misdemeanor count of battery upon an officer and emergency personnel, and the court found him guilty of that count.

statute applies to convictions imposed after its effective date for offenses committed before that date. (*People v. Castillo, supra*, 182 Cal.App.4th at p. 1415, review den. June 9, 2010.) In reaching its conclusion, the court in *Castillo* relied on the California Supreme Court case *People v. Alford* (2007) 42 Cal.4th 749 [68 Cal.Rptr.3d 310, 171 P.3d 32] (*Alford*), which reached the same conclusion regarding a nearly identical statute imposing a court security fee of $30 on every conviction (§ 1465.8). Our Supreme Court noted that the security fee statute, like the criminal convictions assessment for court facilities, was enacted as part of the budgeting process, which could be viewed as an indication that the court security fee was meant to apply to convictions incurred after its operative date. (*Alford, supra*, at p. 754.) Because *Alford* was decided before Government Code section 70373 was enacted, the *Castillo* court concluded that it can be presumed that the Legislature intended the new assessment to work the same way, i.e., to apply to convictions after the new statute's effective date. The Fifth Appellate District subsequently followed this holding in *People v. Phillips* (2010) 186 Cal.App.4th 475, 477 [111 Cal.Rptr.3d 575]. We agree with the analysis and see no reason to depart from these holdings.

## IV. *Mendez's Abstract of Judgment.*

The parties agree that the abstract of judgment pertaining to Mendez must be amended in two particulars. We also agree. " 'It is not open to question that a court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts.' " (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [109 Cal.Rptr.2d 303, 26 P.3d 1040]; see also *People v. Mgebrov* (2008) 166 Cal.App.4th 579, 594 [82 Cal.Rptr.3d 778]; *People v. Alanis* (2008) 158 Cal.App.4th 1467, 1473 [71 Cal.Rptr.3d 139].) Clerical errors can be corrected at any time, and appellate courts "have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts." (*People v. Mitchell, supra*, at p. 185.)

First, the trial court orally imposed sentence for the personal use of a firearm by Mendez in the robbery of Guster under section 12022.53, subdivision (b), but the abstract reflects a sentence pursuant to section 12022.53, subdivisions (b) *and* (e)(1). The reference to subdivision (e)(1) must therefore be stricken.

Second, the trial court orally imposed a Government Code section 70373 assessment against Mendez in the amount of $270, but the abstract reflects the amount "4270.00," which appears to be a simple typographical error. The abstract of judgment must be corrected to state the amount of $270.

## V. *Cruel and Unusual Punishment.*

■ In supplemental briefing, Mendez contends that his sentence of 84 years to life constitutes cruel and unusual punishment because it amounts to a de facto sentence of life without parole (LWOP). Mendez primarily relies on the recent United States Supreme Court case of *Graham v. Florida* (2010) 560 U.S. ___ [176 L.Ed.2d 825, 130 S.Ct. 2011] (*Graham*), in which a divided court held that a sentence of LWOP for any juvenile offender who did not commit a homicide is unconstitutional as cruel and unusual under the Eighth Amendment. (*Graham, supra*, 560 U.S. at pp. ___, ___ [130 S.Ct. at pp. 2030, 2034].) Mendez argues that because he was 16 when he committed the nonhomicide crimes, his sentence cannot stand under *Graham*.[8]

In *Graham*, while the defendant was age 16, he and three classmates attempted to rob a restaurant where one of the youths worked. One of Graham's accomplices struck the restaurant manager, who required stitches. Graham pleaded guilty to armed robbery with assault or battery, and attempted armed robbery. He promised to turn his life around, and the court sentenced him to probation. (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2018].) Less than six months later, Graham participated in a home invasion robbery in which he and his accomplices held the occupant at gunpoint. Finding that Graham had thrown away his opportunity to reform himself, the trial court sentenced him to the maximum on each count, which included life imprisonment. Because Florida has abolished its parole system, there was no possibility that Graham would be released absent executive clemency. (*Id.* at p. ___ [130 S.Ct. at p. 2020].) The United States Supreme Court reversed, holding that LWOP is an unconstitutional sentence for any juvenile who does not commit murder. (*Id.* at pp. ___, ___ [130 S.Ct. at pp. 2030, 2034].)

■ Mendez supports his contention that his sentence is a de facto LWOP sentence by pointing out that he will not be eligible for parole until he is well

---

[8] The trial court calculated Mendez's sentence as follows: Count 1 (carjacking) 25 years to life (with a minimum eligibility for parole of 15 years plus 10 years for the § 12022.53, subd. (b) enhancement (personal use of firearm)); count 2 (robbery) four years four months (one-third the midterm of three years plus one-third of 10 years for the § 186.22 gang enhancement); counts 3 and 4 (robberies) four years four months each (one-third the midterm of three years plus one-third of 10 years for the § 12022.53, subds. (b) and (e)(1) enhancements (use of firearm by a principal)); count 6 (robbery), which the court chose as the principal determinate term, 23 years (three years plus 10 years for the § 186.22 enhancement and 10 years for the § 12022.53, subd. (b) enhancement); counts 7, 8, 9 (robberies) seven years eight months each (one-third the midterm of three years plus one-third of 10 years for the § 186.22 enhancements and one-third of 10 years for the § 12022.53, subd. (b) enhancements). The court imposed a concurrent sentence of eight years for count 5 (assault with a firearm) (three years plus five years for the § 186.22 enhancement). The court struck the enhancements on counts 3 and 4 for the section 186.22 and 12022, subdivision (a)(1) allegations, as well as the section 12022.53, subdivisions (b) and (e)(1) on counts 8 and 9.

past his life expectancy, which currently, for an 18-year-old American male, is 76 years. (National Center for Health Statistics, Centers for Disease Control, National Vital Statistics Reports (June 28, 2010) table 2, vol. 58, No. 21; see also *People v. Romero* (2002) 99 Cal.App.4th 1418, 1427–1428 [122 Cal.Rptr.2d 399].) Mendez was sentenced at the age of 18, at which time he received 848 days of presentence credit. Since his offenses were violent felonies (§ 667.5, subd. (c)), he is limited to 15 percent worktime credit on his determinate sentence (§ 2933.1, subd. (a)). And since his life term on count 1, carjacking, carries a 15-year minimum parole eligibility against which he cannot earn prison worktime credit (see *People v. Buckhalter* (2001) 26 Cal.4th 20, 31 [108 Cal.Rptr.2d 625, 25 P.3d 1103]; § 186.22, subd. (b)(4)), he will not be eligible for parole until he is older than 88 years of age. We agree with Mendez that his sentence and an LWOP sentence are "materially indistinguishable." (*Williams v. Taylor* (2000) 529 U.S. 362, 405, 406 [146 L.Ed.2d 389, 120 S.Ct. 1495].)

We disagree with Mendez that his de facto LWOP sentence should be reversed pursuant to the holding in *Graham*. As the People note, *Graham* expressly limited its holding to juveniles actually sentenced to LWOP: "The instant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense." (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2023]; see also *id.* at p. ___, fn. 10 [130 S.Ct. at p. 2052, fn. 10] (dis. opn. of Thomas, J.) [noting that the majority's analysis involved "only those juveniles sentenced to life without parole and excludes from its analysis all juveniles sentenced to lengthy term-of-years sentences (*e.g.*, 70 or 80 years' imprisonment)"].) Mendez's sentence is not technically an LWOP sentence, and therefore not controlled by *Graham*. We are nevertheless guided by the principles set forth in *Graham* in evaluating Mendez's claim that his sentence is cruel and unusual.

While *Graham* emphasized that a state is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime, the court does require that a state "must" give a juvenile "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2030].) Although the court did not define what constitutes a "meaningful" opportunity for parole, leaving it to "the State, in the first instance, to explore the means and mechanisms for compliance" (*ibid.*), common sense dictates that a juvenile who is sentenced at the age of 18 and who is not eligible for parole until after he is expected to die does not have a meaningful, or as the court also put it, "realistic," opportunity of release (*id.* at p. ___ [130 S.Ct. at p. 2034]). Mendez's sentence essentially "guarantees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to

demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes." (*Id.* at p. ___ [130 S.Ct. at p. 2033].)

The Supreme Court was careful to note that some juveniles who commit truly horrifying crimes may in fact turn out to be "irredeemable" and thus deserving of incarceration for the duration of their lives. (*Graham, supra,* 560 U.S. at p. ___ [130 S.Ct. at p. 2030].) But the court ruled that such an assessment may not be made at the "outset" because it denies the juvenile offender a chance to demonstrate growth and maturity. (*Id.* at pp. ___, ___ [130 S.Ct. at pp. 2029, 2030].) Mendez makes a compelling argument that the trial court here did just that. Just prior to imposing sentence, the trial court stated the following: "You know, when I was a young attorney, I used to appear in front of a judge who used to use the term 'sociopath.' He overused the term, because he used it for everyone who came before him who was sentenced on a serious case. I haven't used that term, either as an attorney or much as a judge. Then, I opened Mr. Mendez's probation report, and I looked at his juvenile record since age ten, and I saw that he was sent to the Youth Authority for robbery at age twelve in Los Angeles County. Then I saw the crime spree that I witnessed this defendant do. I'm totally convinced that this particular defendant has no conscience, has no conscience for society or other people's lives and property. He just doesn't understand the importance of being a law-abiding member of society, not at all, and he's proven that since age ten." The court then proceeded to impose consecutive sentences, rather than concurrent sentences, for what it characterized as Mendez's "independent acts of violence against all separate victims." The trial court may turn out to be correct in its implied assessment that Mendez is a sociopath, or at the very least that Mendez should be separated from society for the duration of his life, but *Graham* makes clear that a sentence based on such a judgment at the outset is unconstitutional. (*Id.* at p. ___ [130 S.Ct. at p. 2029].)

 Even without *Graham,* we would conclude that Mendez's sentence is unconstitutional when evaluated under the traditional "proportionality" test used by the federal and state courts when evaluating individual claims that a sentence is cruel and unusual. Although articulated slightly differently, both standards prohibit punishment that is "grossly disproportionate" to the crime or the individual culpability of the defendant. (*Solem v. Helm* (1983) 463 U.S. 277, 288 [77 L.Ed.2d 637, 103 S.Ct. 3001]; *People v. Dillon* (1983) 34 Cal.3d 441, 450, 478, fn. 25 [194 Cal.Rptr. 390, 668 P.2d 697].) Under both standards, the court examines the nature of the offense and the defendant, the punishment for more serious offenses within the jurisdiction, and the punishment for similar offenses in other jurisdictions. (*Solem v. Helm, supra,* at pp. 290–291; *In re Lynch* (1972) 8 Cal.3d 410, 425, 431, 436 [105 Cal.Rptr. 217, 503 P.2d 921].) Any one of these three factors can be sufficient to

demonstrate that a particular punishment is cruel and unusual. (*People v. Dillon, supra*, at p. 487, fn. 38.)

█ There is no question that Mendez's crimes are serious crimes deserving serious punishment. He confronted his victims at night with other known gang members, usually outnumbering the victims; he brandished a loaded gun at several victims, thus increasing the risk of death or injury; and he demanded and took their personal belongings. But Mendez did not personally inflict physical injury on any of his victims or discharge his firearm. Certainly, his crimes are less serious than other crimes such as murder or rape. "[W]hen compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2027].)

Mendez's age at the time he committed these crimes is also highly relevant to the analysis. "Petitioner's youth is relevant because the harshness of the penalty must be evaluated in relation to the particular characteristics of the offender." (*In re Nuñez* (2009) 173 Cal.App.4th 709, 735 [93 Cal.Rptr.3d 242] (*Nuñez*), citing *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368].) "The age of the offender and the nature of the crime each bear on the analysis." (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2027].) As *Graham* noted, *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183], established that "[a]s compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influence and outside pressures, including peer pressure'; and their characters are 'not as well formed.' " (*Graham, supra*, at p. ___ [130 S.Ct. at p. 2026]; see *Roper, supra*, at pp. 569–570; *In re Baker* (2007) 151 Cal.App.4th 346, 376–377 [59 Cal.Rptr.3d 746] [noting, in reliance on United States Supreme Court precedent, that " ' "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside" ' "].) Here, it can be reasonably assumed that Mendez was influenced by peer pressure. He did not commit his crimes alone, but with fellow gang members, and his older brother was a Blythe Street gang member. As Chief Justice Roberts noted in his concurrence to *Graham*, "There is no reason to believe that [Mendez] should be denied the general presumption of diminished culpability that *Roper* indicates should apply to juvenile offenders." (*Graham, supra*, at p. ___ [130 S.Ct. at p. 2040].)

█ We are particularly troubled here by the fact that the record is silent as to Mendez's personal and family life and upbringing. This is important because the particular characteristics of the offender are relevant to the harshness of the penalty and a defendant's culpability. (*Nuñez, supra*, 173

Cal.App.4th at p. 735, citing *Enmund v. Florida, supra*, 458 U.S. 782.) The record is silent as to the reasons Mendez joined a gang in the first place, any drug use, mental health issues, educational level, etc. It may well be the case that there were mitigating factors that would diminish his culpability and expose the harshness of his sentence. But we simply have no such knowledge here. And it does not appear that the trial court had any such evidence before imposing consecutive sentences.

In *Nuñez*, which held that a 14-year-old's LWOP sentence for kidnapping for ransom was cruel and unusual, the court specifically considered the factor that the defendant suffered posttraumatic stress disorder at the time he committed the kidnapping as the result of having witnessed his brother's slaying 19 months earlier. (*Enmund v. Florida, supra*, 458 U.S. at p. 786.) And in *Graham*, the court likewise described the defendant's background, noting that his parents were drug addicts, that he had been diagnosed with attention deficit hyperactivity disorder in elementary school, and that he began drinking at age nine and smoking marijuana at age 13. (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2018].)

While the record contains a probation report indicating that Mendez has arrests and/or adjudications for theft, burglary, robbery, battery, and criminal threats beginning at the age of 10, there is no information about the specific dispositions or outcomes with respect to several of the offenses. For example, while the probation report indicates that he was arrested for battery at the age of 11, the only information stated is "no further disposition." There is also no information concerning his second charge of battery at the age of 12, other than "disposition: to juvenile hall."

Additionally, we cannot ignore that codefendant Ramos received a sentence nearly half.as long as Mendez's. The People argue this is because Ramos's lack of personal use of a firearm made him ineligible for the gang enhancement, and thus for a life term, on count 1 (carjacking). (§§ 12022.53, subd. (e)(2), 186.22, subd. (b)(4)(B).) But Ramos, not Mendez, was the only defendant who physically injured a victim. The fact that a defendant's actions in committing the crimes did not result in physical injury "reflect[s] on his or her culpability and, in turn, serve[s] as some measure for the harshness of the sentence imposed." (*Nuñez, supra*, 173 Cal.App.4th at p. 736.)

We conclude that Mendez's youth and the absence of injury or death to any victim raise the strong inference that Mendez's de facto LWOP sentence is grossly disproportionate to his crimes and culpability. We therefore move to the second prong of the proportionality test, i.e., a comparison of the

challenged penalty with the punishment in California for more serious crimes.[9] (*In re Lynch, supra*, 8 Cal.3d at p. 431.)

Mendez devotes little of his briefing to this issue, primarily relying on *Nuñez, supra*, 173 Cal.App.4th 709, in which the court noted that California's sentencing scheme made a "perverse distinction" between juvenile offenders under 16 years old, providing for harsher punishment for those who do not harm a victim kidnapped for ransom than for those who commit murder with special circumstances. (*Id.* at pp. 729–730; see also *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 17 [50 Cal.Rptr.3d 184] [noting that juvenile offenders who commit special circumstances murder under the age of 16 may only receive a term of 25 years to life with possibility of parole, and that if the offender was 16 years or older, punishment may be LWOP or 25 years to life at the court's discretion].) By contrast, Mendez received a de facto LWOP sentence for nonhomicide crimes in which he did not inflict any physical injury on his victims. That strikes us as a sentence that is grossly disproportionate to the crimes committed and the culpability of the defendant.

As to the third prong of the test, Mendez does not provide any information regarding punishments for his crimes in jurisdictions outside of California. His briefing is therefore deficient in this regard. But as noted above, only one of the three proportionality factors is sufficient for a sentence to be declared cruel and unusual. The People cite to a handful of out-of-state statutes for the proposition that comparable sentences can be imposed on juveniles who commit gang related offenses, crimes involving the use of a firearm, carjacking and/or robbery. While this may be true, it does not change our analysis. Nor does the People's reliance on *Hawkins v. Hargett* (10th Cir. 1999) 200 F.3d 1279, which found that a 100-year sentence for a juvenile who was almost 14 when he committed his crimes did not constitute cruel and unusual punishment. There, a defendant who was one month shy of turning 14 broke into his neighbor's house, brandished a kitchen knife, tied her with ropes and blindfolded her, then raped and sodomized her repeatedly during the course of two and a half hours, all the while threatening to kill her and her children if she told the police. (*Id.* at p. 1280.) In finding the lengthy sentence to be constitutional, the court noted that "good time" credits were available to the defendant, that he had already completed his sentence for the rape and sodomy convictions, that he was slated to serve a total of 35 years for all four of his convictions combined, and that he would be eligible for parole in approximately 15 years. (*Id.* at p. 1284.) The same cannot be said here.

---

[9] In his concurrence in *Harmelin v. Michigan* (1991) 501 U.S. 957 [115 L.Ed.2d 836, 1005, 111 S.Ct. 2680], Justice Kennedy suggested that "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."

In reaching our conclusion that Mendez's sentence is the equivalent of LWOP and that it is cruel and unusual punishment, we are mindful of the fact that successful challenges to sentences on the grounds of cruel and unusual punishment are rare. (*Nuñez, supra,* 173 Cal.App.4th at pp. 734, 735; *Rummel v. Estelle* (1980) 445 U.S. 263, 272 [63 L.Ed.2d 382, 100 S.Ct. 1133].) Nevertheless, we find this to be such a rare case, and we therefore remand the matter to the trial court for reconsideration of Mendez's sentence.

## DISPOSITION

The trial court is directed to amend the abstract of judgment as to Mendez as described in part IV. above. The matter is remanded to the trial court as to Mendez for reconsideration of his sentence in light of the principles discussed in this opinion. In all other respects, the judgments are affirmed.

Boren, P. J., and Ashmann-Gerst, J., concurred.

Appellants' petitions for review by the Supreme Court were denied December 1, 2010, S187099.