Filed 8/18/14  P. v. Cruz CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>FRANCISCO ALEJANDRO CRUZ,<br><br>　　　Defendant and Appellant. | B246678<br><br>(Los Angeles County<br>Super. Ct. No. VA117044) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Affirmed.

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Francisco Alejandro Cruz was 21 when he committed eight counts of assault with a semiautomatic weapon, six of which were on police officers. For his crimes, he was sentenced to 62 years 8 months to life in prison. He contends that his sentence constitutes cruel and unusual punishment. We disagree.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Factual background.

A.      *The Chestnut Avenue shooting.*

Jose Gonzalez ("Payaso"), Danny Salizar ("Green Eyes"), Ruben Ruiz ("Chucky"), Mario Ortiz ("Criminal"), and defendant ("Snoopy") were members of Southside Players, a gang claiming territory in South Gate. Gonzalez and Ruiz testified at defendant's trial.

On the evening of January 9, 2009, Gonzalez was at "Reckless's" house. Gonzalez had a semiautomatic handgun that would jam after it was fired. Gonzalez shot the gun once into the dirt, but he did not clear the jam. Gonzalez left the party in his white Chevy Tahoe and picked up Salizar, Ruiz, and defendant.

Gonzalez was on Chestnut Street when defendant told him to stop the car, saying he was going to get some drugs. Ruiz told defendant to be careful, and defendant told him not to worry, he was " 'strapped,' " that is, he had a gun. After defendant got out of the car, Gonzalez and Ruiz heard gunshots coming from the direction in which defendant had walked. Defendant got back into the car and told Gonzalez to " 'go,' " " 'I never seen nobody drop like that.' " Gonzalez dropped defendant off on Independence Street, and as defendant got out of the car, Gonzalez could see that he had a rifle. After getting out of the car, defendant ran across railroad tracks toward Ortiz's house.

At the same time, about 10:30 p.m., Daniel Ramirez was outside his home on Chestnut with Adolfo Rincon and "Travis." A light colored or white sports utility vehicle passed them twice before stopping. A man walked towards them, calling for "Andrew." Ramirez said that Andrew didn't live there. The man said, "Players," and Ramirez replied, "Pobre." The man shot at them with a rifle, but nobody was injured.

2

B.    *The Garden View Avenue shooting.*

After the shooting on Chestnut Avenue, Gonzalez was on his way to Ruiz's house when Officer Marcelo Bedetti, having received a report of shots fired involving a white Chevy Tahoe, stopped Gonzalez on Garden View. Additional officers arrived, including David Sanchez, Daniel Bernabe, Antonio Mendez, Heriberto Gutierrez, Christopher Vajrabukka, Daniel Melendrez, and Srgt. Hana Campos. The officers were putting the suspects (Gonzalez, Salizar, and Ruiz) into separate patrol cars when gunshots rang out.[1]

On hearing the gunshots, Officer Sanchez pushed a suspect into the car and then crouched down for cover. Officer Bedetti saw sparks "within feet of myself" and heard a "whizzing sound" that was "intense, and loud, and powerful." Officer Bernabe saw two bullets strike the ground between his legs and next to him. Officer Mendez heard a shot go by and one or two shots hit the ground. Sergeant Campos was next to Officer Mendez when she heard "pop" sounds and saw sparks flying by. Officer Vajrabukka heard six or seven gunshots and saw a spark next to his foot.

Miguel Lopez was at his home on Garden View when he heard the gunshots. He saw a person run and get into the rear passenger side of a vehicle.

C.    *The arrest of defendant and the investigation.*

Six .30-caliber cartridge cases were recovered from the scene. A vehicle parked on Garden View was struck by bullets.

Around midnight, Jorge Duenas went outside because he heard helicopters. Having learned that there was a rifle nearby and not wanting children to find it, Duenas recovered a .30-caliber rifle from behind a tree.

While in jail together, defendant told Gonzalez "[n]obody has put in work" like him and that he did what he did " 'so they would let you guys go.' " Defendant was also recorded telling Ruiz he did it to "distract the cops" so that "you guys could leave."

---

[1]    Approximately 30 minutes passed between the time Gonzalez, Salizar, and Ruiz were stopped and shots were fired.

3

Gonzalez entered into a plea agreement under which he pled to attempted murder, possession of a weapon, and to a gang allegation in exchange for a suspended sentence of 15 years in prison.

D.    *Gang expert testimony.*

According to Detective Derek O'Malley, the People's gang expert, the Southside Players gang had about 10 to 15 active members from the second half of 2009 to the first half of 2010. Southside Players and Florencia 13 are rivals. Defendant admitted to being an active member of Southside Players numerous times. Gonzalez, Ruiz, and Ortiz are members. The gang's primary activities range from felony vandalism, thefts, robberies, burglaries, carjacking, home invasion robberies, assaults, attempted murders, murder, weapon violations, drug sales, drug possession, attempted murder on police officers, and murder. A gang member who shoots at police officers detaining "his homeboys" does it to show his loyalty to them and to elevate his status in the gang.

## II.    Procedural background.

In connection with the shooting on Chestnut, a jury, on October 11, 2012, found defendant not guilty of the attempted murders of Rincon and Ramirez. But the jury found him guilty of two counts of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)).[2] The jury found true a gang allegation (§ 186.22, subd. (b)(1)(A), (B) & (C)), but it found a personal gun use allegation (§ 12022.5, subd. (a)) not true.

In connection with the shooting on Garden View, the jury found Cruz not guilty of six counts of attempted murder of the peace officers. The jury did find him guilty of six counts of assault on peace officers with a semiautomatic firearm (§ 245, subd. (d)(2)). The jury found true personal gun use allegations (§ 12022.53, subds. (b) & (c)) and a gang allegation (§ 186.22, subd. (b)(1)(A), (B) & (C)).

---

[2]    All further undesignated statutory references are to the Penal Code.

4

Cruz was sentenced on January 31, 2012. At Cruz's sentencing hearing, South Gate Chief of Police Randy Davis called Cruz's crime "one of the most callous acts of violence" he had ever seen. The Chief said that although none of the eight officers were physically injured, they and their families suffered emotional damage. He also spoke of the "long lasting [e]ffect" of this incident on his department and asked the court to impose the maximum sentence.

The trial court selected count 12 as the base term and sentenced Cruz to the high term of 9 years, a consecutive 20 years for the gun use enhancement, and a consecutive 10 years for the gang enhancement (39 years). On count 13, the court sentenced him to 2 years 4 months; 6 years 8 months for the gun use enhancement (9 years). On count 14, the court sentenced Cruz to the same sentence as on count 13 (9 years). On count 4, the court sentenced Cruz to 2 years plus 1 year 8 months for the gang enhancement (3 years 8 months). On count 23, the court sentenced him to two years. The court imposed concurrent terms on counts 15, 16, and 17. His total sentence therefore was 62 years 8 months.

## DISCUSSION

### I.      Cruel and unusual punishment.

At the time Cruz committed the crimes he was 21 years old. Based largely on his age and that none of the victims were physically injured, he contends his 62 years 8 months sentence[3] constitutes cruel and unusual punishment (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17 [prohibiting cruel or unusual punishment]).[4] We disagree.

---

[3]      According to defendant's calculations, he would have to serve more than 50 years and 85 percent of his sentence (§§ 667.5, subd. (c)(8), 2933.1) before being eligible for parole. Because he was 24 at the time of sentencing, he would be in his mid-70's before being eligible for parole.

[4]      The People contend that the issue has been forfeited because Cruz did not object to his sentence as cruel and unusual in the trial court. (*People v. Burgener* (2003) 29 Cal.4th 833, 886 [defendant forfeited cruel and unusual punishment claim "by failing to articulate an objection on federal constitutional grounds" in the trial court]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1231, fn. 17 [claims of constitutional error based on

A sentence violates the federal Constitution only if it is "grossly disproportionate" to the severity of the crime. (U.S. Const., 8th Amend.; *Graham v. Florida* (2010) 560 U.S. 48, 59-60; *People v. Carmony* (2005) 127 Cal.App.4th 1066, 1076.) A punishment for a term of years violates the Eighth Amendment to the United States Constitution if it is an " 'extreme sentence[] that [is] "grossly disproportionate" to the crime.' [Citation.]" (*Ewing v. California* (2003) 538 U.S. 11, 23 [third strike sentence for shoplifting golf clubs worth $1,200] (plur. opn. of O'Connor, J.); see also *Lockyer v. Andrade* (2003) 538 U.S. 63, 72 [third strike sentence for two counts of petty theft with a prior for stealing, on separate occasions, not cruel and unusual]; *Harmelin v. Michigan* (1991) 501 U.S. 957 [life without parole sentence for possession of cocaine was not cruel and unusual].) The Eighth Amendment does not require strict proportionality between crime and sentence. (*Carmony*, at p. 1076.) Thus, in a noncapital case, " 'successful challenges to the proportionality of particular sentences have been exceedingly rare.' [Citation.]" (*Ewing*, at p. 21.)

A punishment violates the California Constitution if, "although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted; see also *People v. Dillon* (1983) 34 Cal.3d 441, 478; *People v. Haller* (2009) 174 Cal.App.4th 1080, 1092; *People v. Em, supra,* 171 Cal.App.4th at p. 972.) In making this determination, we (1) examine the nature of the offense and the offender; (2) compare the punishment with that prescribed for more serious crimes in California; and (3) compare the punishment with that given for the same offense in other jurisdictions. (*In re Lynch*, at pp. 425-427; *Em*, at p. 972.) We consider the seriousness of the crime in the abstract and the totality of the circumstances surrounding its commission, including motive, manner of commission, the extent of the

federal and state constitutions are waived in the absence of a constitutional objection in the trial court].) We address the merits. (See, e.g., *People v. Em* (2009) 171 Cal.App.4th 964, 971 & fn. 5 [to avoid the inevitable ineffective assistance of counsel claim, appellate courts may address cruel and unusual punishment issue raised on appeal in the absence of an objection in the trial court].)

defendant's involvement, the consequences of his acts, and factors such as age, prior criminality, personal characteristics, and state of mind.  (*People v. Felix* (2003) 108 Cal.App.4th 994, 1000; *Dillon*, at p. 479.)  A defendant must overcome a considerable burden to show a sentence is disproportionate to his or her level of culpability, and findings of disproportionality have occurred " 'with exquisite rarity in the case law.' " (*Em*, at p. 972.)

Defendant analogizes his case to *People v. Mendez* (2010) 188 Cal.App.4th 47 (*Mendez*).  Mendez was 16 at the time he committed the nonhomicide offenses (carjacking, assault with a firearm, second degree robbery with gang and gun enhancements).  (*Id.* at p. 50.)  He was sentenced to 84 years to life in prison.  (*Ibid.*)  Mendez based his argument that his sentence violated the Eighth Amendment on *Graham v. Florida, supra,* 560 U.S. 48, which held that juveniles who commit nonhomicide offenses may not be sentenced to LWOP.  Although Mendez was not technically sentenced to LWOP, *Mendez* nonetheless relied on principles stated in *Graham* to find that Mendez's sentence was cruel and unusual.  A juvenile nonhomicide offender must be given " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' [Citation.]" (*Mendez*, at p. 63.)  Even without *Graham*, the court found, under the proportionality test used by state and federal courts, that Mendez's age and that he didn't personally inflict injury on the victims raised a strong inference his sentence was grossly disproportionate to his crimes and culpability.  (*Id.* at pp. 64-67.)

*Mendez* is distinguishable from this case.  Although young at the time he committed the crimes, defendant was 21 and therefore not a juvenile.[5]  In *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482, the defendant committed a murder a mere

---

[5]      The United States Supreme Court and our California Supreme Court have issued a line of cases about juvenile offenders:  the death penalty may not be imposed on juvenile offenders (*Roper v. Simmons* (2005) 543 U.S. 551); LWOP may not be imposed on a juvenile who commits a nonhomicide offense (*Graham v. Florida, supra,* 560 U.S. 48); mandatory LWOP may not be imposed on a juvenile offender (*Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455]); a de facto LWOP sentence may not be imposed on a juvenile nonhomicide offender (*People v. Caballero* (2012) 55 Cal.4th 262).

five months after his 18th birthday. *Argeta* rejected the argument that the defendant's age made his sentence cruel and/or unusual: "These arguments regarding sentencing have been made in the past, and while '[d]rawing the line at 18 . . . is subject . . . to the objections always raised against categorical rules . . . [, that] is the point where society draws the line for many purposes between childhood and adulthood . . . .' [Citations.]" (*Id.* at p. 1482.)

Although defendant's young age is certainly a factor we consider when determining whether his sentence is grossly disproportionate to his crimes and culpability, that factor does not negate the severity of his crimes. In one evening, he participated in the assaults against Ramirez and Rincon. Not more than an hour later, he attempted to effect the escape of his fellow gang members from police officers by shooting at the officers. None were physically injured, but South Gate's chief of police spoke of the emotional injuries the officers and the department suffered as a result of defendant's crimes. Moreover, despite his youth, defendant was a member of a violent street gang and had two sustained juvenile petitions and an adult criminal history that included misdemeanor petty theft, felony vandalism, misdemeanor sex with a minor, and misdemeanor theft. True, these are not crimes of violence, but they do say something about the offender. (See, e.g., *People v. Em, supra,* 171 Cal.App.4th at p. 976 [balancing the defendant's age (15) against the seriousness of his crime (murder), his gang-related criminal history, and the danger he presented to society, his 50-years-to-life sentence was not disproportionate to the crime].)

In addition to his young age, defendant points out the *Mendez* court was troubled the codefendant received a sentence nearly half as long as Mendez's, although the codefendant was the only participant in the crime who physically injured a victim. (*Mendez, supra,* 188 Cal.App.4th at p. 66.) *Mendez* again is distinguishable. Here, Ruiz was charged with attempted murder in connection with the shooting on Chestnut, but the case was dismissed in exchange for testifying against defendant. Gonzalez received a 29-year suspended sentence for pleading guilty to attempted murder, conditioned on his truthful testimony against defendant. At some point, Gonzalez will be allowed to

8

withdraw his plea, plead guilty to discharging a firearm and to a gang allegation, and to receive a suspended 15-year prison sentence and a five-year formal probationary term. There is, therefore, no doubt that Gonzalez and Ruiz received far more lenient treatment than defendant. But they also did not participate in all of defendant's crimes; specifically, they had nothing to do with the second incident on Garden View where defendant assaulted police officers. In fact, Gonzalez and Ruiz, in addition to the numerous police officers present, were potential victims of defendant's assault.

Although defendant's cruel and unusual argument is based primarily on *Mendez*, he cursorily also argues that his "de facto LWOP sentence" is grossly disproportionate when one considers, for example, that second degree murderers previously convicted of murder may receive "as little as" 15 years to life, in the sentencing court's discretion (§ 190.05, subd. (a)). But defendant committed crimes against *eight* separate victims and personally used a firearm in connection with the assaults against the six police officers. His use of a firearm in connection with six of the eight assaults brought him within the ambit of section 12022.53 and its significant sentencing enhancing provisions. (See, e.g., *People v. Em, supra,* 171 Cal.App.4th at p. 973 [sentence enhancement of 25 years to life is not disproportionate to a violation of section 12022.53].)

We therefore cannot find that defendant's sentence violates either the state or federal proscriptions against cruel and/or unusual punishment.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.