Filed 11/26/14  P. v. Eldridge CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050273 |
| v. | (Super. Ct. No. FMB1200441) |
| SONNY VERDUGO ELDRIDGE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Michael M. Dest.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Sonny Verdugo Eldridge guilty of second degree robbery (count 1), second degree commercial burglary (count 2), false imprisonment by violence, (count 3), and street terrorism (count 4). The jury also found true the gang enhancements as to counts 1, 2, and 3, and the firearm use allegation as to count 3. The court sentenced Eldridge to serve a total of 16 years and eight months in prison. On appeal, Eldridge contends the evidence of his prior arrest for the sale of marijuana and his conviction for the lesser offense of possessing marijuana was error and should have been excluded. We agree but find the error not prejudicial, and therefore, we affirm the judgment.

I

On September 21, 2012, James Hayes was washing windows at Check Into Cash in Yucca Valley when he spotted two men wearing ski masks walking towards him. Hayes could see through the eye holes of the ski mask that one of the men was white and the other Hispanic. The Hispanic male, later identified as Danny Castro, was on the shorter side and wore a hooded sweatshirt and shorts. The white male, later identified as James Schutte, was tall and wore a hooded sweatshirt with jeans. Schutte had a gun and told Hayes to get inside the Check Into Cash store. Once inside, Schutte ordered everyone onto the floor. Schutte and Castro took $1,276 from the cash register and then fled.

Deputy Erik Smoot responded to the scene of the robbery, and observed two Hispanic males—later identified as Eldridge and Juan Servin—walking quickly along the shoulder of the road near Check Into Cash. Smoot made contact with the startled men and asked for identification. Smoot noted Eldridge was shaking and his voice was trembling as he handed over his identification. Eldridge and Servin sat on the curb and explained to the police officer they were walking to the community center. Smoot decided to handcuff Eldridge and Servin based on the fact Eldridge was shaking, they were walking hastily away from the scene of the robbery, and they were walking in the same direct path Schutte and Castro had taken to flee. One of the bystanders of the

2

robbery was asked to identify Eldridge or Servin as suspects, but she was unable to identify them. The two men were released.

Meanwhile, Schutte and Castro fled on foot but were eventually found. No fingerprints were recovered at the store, indicating the perpetrators were wearing gloves. During a search of the surrounding area, the police found a pair of new black gloves balled up near the escape path used by one of the robbers.

Smoot later interviewed Castro. Castro had several tattoos including an arrowhead tattoo on the right side of his neck with the letters "SB" for San Bernardino, an "S" on the back of his left arm, and an "IE" for Inland Empire on his left hand. Castro's Facebook page also showed a picture of himself with Servin holding up the letter "F" with his right hand for Flats—a short hand symbol for South Side Verdugo Flats—a San Bernardino gang. After seeing this photo, Smoot realized it may not have been a coincidence that Servin and Eldridge were approximately 100 feet away from Check Into Cash just 11 minutes after the robbery.

Smoot talked further with Castro about the planning of the robbery, and Castro directed him to a 99 Cent Only Store and Wal-Mart. Smoot reviewed the surveillance video from the stores, and saw Castro, Schutte, Servin, and Eldridge enter the 99 Cent Only Store the day before the robbery. Eldridge purchased two pairs of gloves, two beanies, and two hockey masks. The new pair of black gloves found by the police following the robbery had the same serial number as the gloves Eldridge bought at the 99 Cent Only Store. The surveillance footage from Wal-Mart showed the four men arriving in Eldridge's car before entering the store where Servin bought two-way radios.

Smoot was also able to find surveillance footage taken near the community center where Eldridge and Servin were first spotted after the robbery. While reviewing the video recording taken prior to the burglary, Smoot spotted Eldridge walking with a red T-shirt underneath a black T-shirt. However, when Smoot stopped Eldridge

3

following the burglary, Eldridge was not wearing a red t-shirt. When the police observed Schutte in surveillance footage after the robbery, he was wearing a red T-shirt.

Eldridge, Servin, Schutte, and Castro were all arrested. Eldridge was charged with second degree robbery (Pen. Code, §211; count 1),[1] second degree burglary (§ 459; count 2), false imprisonment by violence (§ 236; count 3), and street terrorism (§ 186.22, subd. (a); count 4). The information included a firearm use allegation as to count 3 (§ 12022.53, subd. (b)), and gang enhancements as to counts 1, 2, and 3 (§ 186.22, subd. (b)(l)).

During the trial, San Bernardino Police Officer Raymond Bonshire testified as a gang expert, specifically about the Hispanic gang South Side Verdugo Flats (SSVF). He said the members of the gang refer to themselves as The Flats or SSVF, and their territory covers the southwest portion of San Bernardino. SSVF's gang sign is to make the letter "F" with their fingers. Bonshire estimated there were over 100 documented members and the gang's crimes included robberies, shootings, murders, vehicle thefts, firearm possession, and narcotic sales.

Bonshire testified he was familiar with Eldridge from personal contacts and investigations. He knew Eldridge's moniker was "Slick." Based on his review of arrest reports, Bonshire stated Eldridge was arrested in 2011 for possession and sale of concentrated cannabis. Bonshire represented he had the "background, training and experience [to] recognize[e] possession for sale[.]" He opined there was information in the 2011 arrest report indicating Eldridge possessed the marijuana for sale (even though he was not convicted of that offense).

Bonshire explained individuals selling marijuana often have money in small denominations "that indicate[] street level," and cell phones to send text messages.

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

He also testified drug dealers typically will be found in areas where narcotics are being sold. Bonshire said many of these elements were present in Eldridge's 2011 case. He stated Eldridge "was in possession of the marijuana, the currency[,] and a cell phone with text messages that showed messages for sale." He added that Eldridge was selling the marijuana inside SSVF's territory and there would be serious repercussions if a non-SSVF was selling within the territory. Bonshire explained, "Typically with gangs, their turf area, they control that area. They know who's supposed to be selling narcotics and who's not." After looking at the police arrest report to refresh his memory, Bonshire stated Eldridge had cash in small denominations (ones, fives, and tens), which was consistent with someone who was selling drugs. In addition, Eldridge was carrying a usable amount of marijuana. Bonshire found it significant that Eldridge denied being an SSVF member to the arresting officer, stating it was common behavior for gang members to deny membership. Bonshire stated it was his opinion the 2011 charge for possessing marijuana for sale was "valid" and SSVF was a criminal street gang.

In addition to Eldridge's prior conviction, Bonshire testified about three additional predicate crimes involving the following SSVF gang members: (1) Juan Blanco was arrested and convicted for possessing a firearm; (2) Dominic Rodriguez was arrested and convicted for home invasion robbery; and (3) David Montoya was arrested and convicted for possessing a firearm as a felon.

The San Bernardino Police Department had 18 gang cards on Eldridge, and on nine of those cards, Eldridge self-admitted he was a member of SSVF. In addition to the gang cards, Bonshire testified Eldridge's tattoos were consistent with membership in SSVF. He had a marijuana leaf on his chest (stemming from the origin of the gang and the original name "Marijuanos") and two dollar sign symbols, often meaning "South Side." Bonshire said Eldridge had also been contacted with other documented SSVF members numerous times. Bonshire opined Eldridge was an active member in the SSVF criminal street gang.

Bonshire stated he was also familiar with Castro (having the moniker "June Bug"), Schutte ("JD") and Servin ("Little Clowny"). The police department had gang cards on all of them, Castro and Servin had self-admitted to gang membership. In addition, Castro had tattoos consistent with being a SSFV member. Schutte had not previously admitted being a SSFV member, and Bonshire opined he should be classified as an associate of the gang.

Bonshire testified he helped execute a search warrant at Eldridge's home in 2008. During the investigation, police found two notebooks having Eldridge's gang moniker as well as clothing indicative of SSVF membership. Bonshire also discussed an investigation in 2012 during which an officer reported he asked Eldridge what gang he was from, and Eldridge responded "Verdugo Flats."

Based on a hypothetical matching the facts of the case, Bonshire opined the crimes in the case were committed to benefit SSVF. He stated, "It benefits [the gang] because it shows it's an ongoing criminal organization. Its members are willing to go outside the turf to commit crimes. It shows that . . . multiple members will work together to fill out their mission, and that through that they will gain the respect and that it broadens their gang's turf, their crime turf." He added using a firearm in the crime also enhances one's status in the gang.

*Defense Case*

Eldridge testified his group of friends joked about robbing the check-cashing store, but he did not realize Castro and Schutte were serious about committing the crime. He did not know the robbery had taken place until he saw Schutte surrounded by police. He denied being involved in the robbery and denied being a gang member. Eldridge admitted he associated with gang members because he grew up in SSVF territory and his father is a gang member. Eldridge's sister testified he often talked about not wanting to be involved in the gang like their father. She was aware of the marijuana possession conviction, but she believed it was a misunderstanding. She stated Eldridge

6

had suffered from headaches since he shot himself in the face when he was 17 years old and he carried a medical marijuana card. She testified that the day Eldridge was arrested he was carrying cash to purchase a money order and he kept the medical marijuana in a separate container in his pocket.

II

The sole issue raised on appeal is whether the trial court abused its discretion under Evidence Code section 352 in admitting evidence of Eldridge's 2011 arrest for one crime and conviction of a lesser offense to prove the substantive gang count (count 4) and the gang enhancements. Over Eldridge's objection, the court granted the prosecutor's motion in limine to admit Eldridge's prior arrest and conviction. At trial, over Eldridge's objection, Bonshire was permitted to testify about why the prior arrest for possession for sale was valid and attributable to gang membership, even though the ultimate conviction was for simple possession without any gang enhancements. We conclude admission was erroneous, however, due to the lack of prejudice we affirm the conviction.

The California Street Terrorism Enforcement and Prevention Act (the STEP Act; § 186.20 et seq.) criminalizes active participation in a criminal street gang and the commission of other crimes for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subds. (a) & (b).)[2] "A criminal street gang is any ongoing association that has as one of its primary activities the commission of certain

_____

[2] Section 186.22, subdivision (a), provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." Section 186.22, subdivision (b), provides a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

criminal offenses and engages through its members in a 'pattern of criminal gang activity.' [Citations.] A pattern of criminal gang activity is 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' specified criminal offenses within a certain time frame, 'on separate occasions, or by two or more persons' (the 'predicate offenses'). [Citations.]" (*People v. Tran* (2011) 51 Cal.4th 1040, 1044 (*Tran*).) Section 186.22, subdivision (e), lists 33 specific offenses which qualify as predicate offenses.

Eldridge was charged with one count of participation in a criminal street gang under section 186.22, subdivision (a) (count 4-street terrorism), and it was alleged the other three crimes charged benefitted a criminal street gang under section 186.22, subdivision (b) [street gang enhancement]. Therefore, evidence of Eldridge's gang affiliation and activity was directly relevant to the gang-related charges and enhancements. (*People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams*).) The prosecutor was required to establish that (1) one of the gang's primary activities was commission of one or more of the 33 crimes listed in section 186.22, subdivision (e) (often referred to as predicate offenses), and (2) there was the requisite "pattern" of criminal conduct because two or more predicate offenses were committed on separate occasions by two or more persons. These requirements are often satisfied by the testimony of a police gang expert who can express an opinion on the primary activities of the gang in question. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322.)

In *Tran*, the Supreme Court ruled that evidence of a defendant's own prior criminal conduct may be admitted to prove a predicate offense under the gang enhancement statutes (§ 186.20 et seq.), subject to an appropriate balancing of the probative value of the evidence versus its prejudicial effect under Evidence Code section 352. (*Tran, supra*, 51 Cal.4th at pp. 1046-1050.) The Court rejected the argument that use of a defendant's prior offense to show a predicate offense is necessarily prohibited in all cases by Evidence Code section 352. (*Tran, supra,* 51 Cal.4th at p.

8

1046.) The Supreme Court reasoned, "That evidence of a defendant's separate offense may be admissible to prove a predicate offense does not mean trial courts must in all cases admit such evidence when offered by the prosecution. Considerations such as those described in *People v. Ewoldt* [(1994)] 7 Cal.4th [380,] 404-405 [(*Ewoldt*)], will still inform the trial court's discretion and in an individual case may require exclusion of the evidence." (*Tran, supra,* 51 Cal.4th at p. 1049.)

The Attorney General argues, "[Eldridge's] possession of marijuana for sale was an enumerated felony (§ 186.22, subd. (e)(4)), and it was gang related. [Citing Bonshire's opinion testimony.] Thus, the evidence of [Eldridge's] prior offense was highly probative of his knowledge of [SSVF's] pattern of criminal behavior, as well as his active participation in the gang, and the trial court properly admitted it for that purpose." The Attorney General explains, "evidence of a defendant's gang-related separate offense 'provides direct evidence of a predicate offense' . . . . For that reason, its probative value is generally greater in prosecutions for active participation in a criminal street gang. [*Tran, supra,* 51 Cal.4th at p. 1048]."

We would agree with the Attorney General if Eldridge had been convicted of possessing marijuana for sale. He was not. His conviction was for simply possessing marijuana. (Health & Saf. Code, § 11357, subd. (a).) Simple drug possession is not now, nor has it ever been a qualifying predicate offense for purpose of proving a substantive offense of active gang participation (§ 186.22, subd. (a)), or the enhancement allegation of committing another offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subds. (b) & (e)). In *Tran, supra*, 51 Cal.4th at page 1044, the court held that evidence of defendant's prior conviction of a predicate offense is admissible even if the People could develop evidence of the requisite number of predicate offenses through the presentation of other gang members' convictions. *Tran* in no way stands for the proposition that a prior non-qualifying conviction may be admitted

9

to prove the predicate offenses prong. We conclude it was error to admit evidence of Eldridge's prior non-predicate conviction for drug possession.

Turning to the admissibility of Eldridge's arrest, the Attorney General argues these facts were not cumulative or unduly prejudicial. The Attorney General fails to cite any case authority, and we found none, holding an arrest for a predicate offense is admissible even if defendant was not convicted of it. "Generally, evidence of mere arrests that do not result in convictions is inadmissible because such evidence invariably suggests the defendant has a bad character. (*People v. Duran* [(2002)] 97 Cal.App.4th [1448,] 1458-1459; see also *People v. Anderson* (1978) 20 Cal.3d 647, 650 [holding that evidence of prior arrests was inadmissible because it suggested the defendant had a bad character] . . . .].) A key consideration for trial courts in evaluating the prejudicial nature of the uncharged acts is whether the prior bad acts resulted in criminal convictions; prior convictions minimize the risk the jury would be tempted to punish the defendant for the uncharged acts. ([*Ewoldt, supra,*] 7 Cal.4th [at p.] 405, superseded by statute as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.)" (*People v. Williams* (2009) 170 Cal.App.4th 587, 609-610, fn. omitted.)

In this case, the prejudicial nature of Eldridge's prior arrest for selling drugs was heightened by the gang expert's opinion the underlying facts of the crime indicated it was committed for the benefit of Eldridge's gang. Our record does not show Eldridge's arrest in 2011 resulted in any gang-related charges. And the 2011 conviction for drug possession carried no gang enhancements. Thus, the purported gang nature of the prior offense was an uncharged act proven by expert testimony.

It is generally understood that a jury informed that a defendant has committed a past crime for which he was not punished, may be more inclined to convict on the current charge in part to punish him for his prior misconduct. (*Ewoldt, supra*, 7 Cal.4th at p. 405; *Williams, supra*, 170 Cal.App.4th at pp. 609-610.) The Attorney General argues there was no danger of this because "as with the defendant in *Tran,*

10

[Eldridge's] jury heard that he was convicted—albeit for the lesser offense of simple possession—in connection with his prior offense." This argument is unconvincing. Eldridge's circumstances are nothing like the defendant in *Tran.*

In the *Tran case,* a police officer testified, over defendant's objection, about a series of extortions defendant and several other gang members had made three to four years before the current offense. (*Tran, supra*, 51 Cal.4th at p. 1045.) The officer described some of the facts underlying the crime, including evidence the gang members fired shots into some businesses and made threats against others. The prosecution provided the jury with certified copies of the court record establishing defendant was convicted, on a plea of guilty, for extortion. The court determined evidence of the conviction, and some of the underlying facts, was a proper exercise of the trial court's discretion under Evidence Code section 352. (*Tran, supra,* 51 Cal.4th at p. 1050.) There was no danger of jury confusion because defendant was convicted of the same predicate crime he was arrested for. And it was undisputed extortion was one of the enumerated predicate offenses in section 186.22, subdivision (e)(19). We recognize the Court determined the details of the crime were also admissible in that case, but it also cautioned the same is not true in all cases: "[T]he trial court of course retains discretion to exclude details of offenses or related conduct that might tend to inflame without furthering the purpose for admitting the evidence." (*Tran, supra,* 51 Cal.4th at p. 1050.) The *Tran* Court did not suggest a prosecutor should be permitted to use the details from an arrest report to suggest a defendant should have been, but was not, convicted of a more serious crime.

In the case before us, Eldridge was not convicted of the predicate crime he was arrested for. He was convicted of a non-predicate crime. To make the prior conviction more probative in this case, the prosecutor was allowed to use expert testimony to prove the prior *should have been* a gang-related predicate conviction. Bonshire, using facts from an arrest report, opined Eldridge was guilty of dealing drugs

11

for SSVF in 2011.  In essence, the expert retried Eldridge for prior conduct Eldridge had already pled guilty to.  We conclude the prosecutor should not have been permitted to argue Eldridge's simple possession conviction should be treated as a conviction for something far worse than it was.

In the *Tran* case, the Court reasoned, "[B]ecause defendant stood convicted of the extortion, there was little danger of confusing the issues by requiring the jury to determine if defendant was guilty of both the charged offenses and the extortion, and no risk the jury might convict defendant to prevent him from escaping punishment for the extortion."  (*Tran, supra*, 51 Cal.4th at p. 1050.)  In our case, the jury was asked to determine if Eldridge was guilty of the charged offense for which he was not punished.  Thus, evidence of the prior arrest was highly prejudicial because of propensity inferences that may be drawn from it.  (*People v. Medina* (1995) 11 Cal.4th 694, 769; *People v. Anderson* (1978) 20 Cal.3d 647, 650-651.)

Thus, to briefly summarize, we conclude evidence of *a non-predicate* prior conviction would not be admissible to prove the gang charges in this case.  Evidence of a *mere arrest* for a predicate offense, but for which there was no conviction, would also be inadmissible.  And certainly evidence of the details underlying the prior arrest to prove the conviction *should be treated* as a gang-related predicate offense was more prejudicial than probative under Evidence Code section 352.  Admission of the prior arrest, the underlying facts, and the conviction for a non-predicate offense was error.

It is unclear why the prosecutor went to such great lengths to fit a square peg in a round hole.  We conclude the record contains ample and strong evidence of guilt.  And for this reason, we deem the error regarding admission of the prior arrest and conviction harmless.  It is not reasonably probable Eldridge would have obtained a more favorable result had the court excluded the evidence of his prior arrest and conviction.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

12

For example, the prosecutor only needed to provide evidence of two predicate offenses, and she presented evidence of four (including the underlying offense). (*People v. Galvan* (1998) 68 Cal.App.4th 1135, 1140 ["[E]ither prior conduct or acts committed at the time of the charged offenses can be used to establish the 'primary activities' element of the gang enhancement offense"].) The probative value adding one more (Eldridge's prior conviction/arrest) was low. (*Tran, supra*, 51 Cal.4th at p. 1049 ["the probative value of the evidence inevitably decreases with each additional offense, while its prejudicial effect increases, tilting the balance towards exclusion"].)

Moreover, there was abundant evidence Eldridge was an active member of the SSVF. The officer explained there was the following evidence: (1) 18 gang cards (9 of which show Eldridge self-admits he is a SSVF gang member); (2) Eldridge had tattoos consistent with SSVF gang membership; (3) he had a gang moniker and it was written in a notebook found at his home; (4) he wore clothing indicative of SSVF gang membership; and (5) in a previous investigation he told a police officer he was from "Verdugo Flats" when asked his gang affiliation. These facts are sufficient to establish the gang allegations. (See *People v. Mendez* (2010) 188 Cal.App.4th 47, 56 [similar facts]; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331 [using moniker, tattoos, and verbal admittance to being in gang as evidence to find defendant was actively participating in gang].) In addition, the record shows there was strong evidence Eldridge was involved in the robbery. Videotapes showed he and three others associated with SSVF purchased items commonly used by armed robbers, i.e., masks, beanies, gloves, and walkie-talkies. One pair of the gloves was used during the robbery. And Eldridge was captured near the store soon after it was robbed and he was headed in the same direction as his fleeing comrades. Accordingly, we conclude Eldridge was not prejudiced by the erroneous admission of the prior arrest and conviction.

13

## III

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


ARONSON, J.