Filed 8/11/15  People v. Girard CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B253704 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA091059) |
| v. | |
| DOUGLAS GIRARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur H. Jean, Jr., Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Douglas Girard of the first degree murder of Robert Rodriquez (Pen. Code, § 187, subd. (a); count 5),[1] the attempted robbery of Mark Fisher (§§ 664/211; count 2), possession of ammunition (§ 12316, subd. (b)(1); count 4), and two counts of possession of a firearm by a felon (§ 12021, subd. (a)(1); counts 3 and 6).[2] In all counts, the jury found that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C) in counts 2 and 5; subd. (b)(1)(A) in the remaining counts). In the murder and attempted robbery counts, the jury found that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d) in count 2; subds. (d) and (e)(1) in count 5). The jury found true that defendant had suffered two felony convictions, constituting two strikes (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)), two serious felonies (§ 667, subd. (a)(1)), and resulting in two prior prison terms (§ 667.5, subd. (b)). The trial court sentenced defendant to a total term of 150 years to life in state prison, plus 10 years.

Defendant appeals from the judgment of conviction, contending: (1) the evidence does not support the gang enhancement on the murder count (count 5) and a related count of possession of a firearm by a felon (count 6); and (2) defendant's sentence should be vacated and the case remanded for sentencing before a different judge, because the trial judge demonstrated bias against defendant. We disagree with these contentions and affirm the judgment.

---

[1] All further statutory references are to the Penal Code.

[2] As to the murder charge, defendant was jointly tried with Andres Villafana, whom the jury acquitted. The jury also acquitted defendant of the robbery and attempted murder of Mark Fisher, and acquitted him of two counts of attempted murder of a police officer.

2

# BACKGROUND[3]

*Prosecution Evidence*

*Attempted Robbery of Mark Fisher*

On January 2, 2012, Mark Fisher was moving out of the garage he rented at the home of appellant's girlfriend's mother, Mona, located on Ravenna Avenue in Wilmington. Defendant, a member of the Westside Wilmas (WSW) gang, was present. He displayed a gun in his belt and asked Fisher to speak to Mona about some missing antique bottles. Fisher spoke to Mona, denied taking the bottles, and refused to pay for them. Defendant was present, but did not speak. Fisher offered to give Mona $20 for gas money. He removed $20 from his wallet, which contained $2,600, and gave it to her. Defendant left with Mona and his girlfriend, but returned a half hour later. He pulled out a pistol, ejected the clip, and tried to sell the clip to Fisher for $300 because he was broke. Fisher declined, and defendant left.

About 15 minutes later, defendant returned with a male companion, pointed a gun at Fisher, and demanded that he lie on his stomach and give up his wallet. When Fisher refused, defendant fired a shot which parted Fisher's hair. Fisher struck defendant with a bottle, and defendant shot him in the knee. After a struggle, Fisher was able to fight defendant and his companion off and secure the garage door. Fisher checked his wallet. Initially he thought that defendant had taken about $120, but later on counting his money he was unsure whether any was missing.

About two or three weeks later, defendant's wife asked Fisher not to testify because defendant's family needed him. She paid Fisher for falsifying a notarized

---

[3] Given the limited issues on appeal, we do not attempt to summarize all the evidence introduced a trial.

3

statement disavowing his identification of defendant. She was later convicted of bribery for the incident. At trial Fisher admitted that he testified falsely at the preliminary hearing that he was not certain defendant was the man who shot him.

The police recovered three .40 caliber casings from the scene. As a result of his wound, Fisher's knee was fractured, and he wore a brace and walked with a cane.

*Murder of Robert Rodriguez*

Robert Rodriguez was a WSW member who lived with his girlfriend, Susana Corona, and their six-month-old child in a converted garage on North Wilmington Boulevard in Wilmington. On January 28, 2012, he told Corona that their friend, Andres Villafana, was coming over to show him some speakers.

After Rodriguez exchanged some texts with Villafana using Corona's cell phone, Corona heard scraping on the garage door, and later a knock. Rodriquez pulled the garage door open slightly and asked who it was. There was no response, so he put the door down. Corona heard more scraping or rubbing on the door. Rodriguez opened the door part way and asked again who it was. Corona was able to see a person standing behind a parked van and told Rodriquez. Rodriquez opened the door just enough to exit and left. Through a window in the door, Corona observed a thin male with his hand at his stomach behind the van. She could not see the man's face, but speculated that it was Villafana. The man lifted his arm, and Corona heard two or three shots. Corona hid in the garage and called 911.

The police responded to the scene and recovered six .40 caliber casings and two .45 caliber casings. A forensic comparison later showed that the .40 caliber casings were fired by the same gun used in the attempted robbery of Mark Fisher.

4

Rodriquez succumbed to his wounds. He was shot eight times, including two to the head. A few days later, defendant told fellow WSW member Ivan Zamora that he killed Rodriguez execution style, shooting him seven times in the head, stomach, back and legs.

*Defendant's Arrest*

Around 4:00 p.m. on January 31, 2012, Los Angeles Police Officers David Mock and his partner Brett Hayes encountered defendant, Villafana, and another WSW member in an alley. The three threw gang signs at the officers. When the officers stopped and exited the car, defendant pointed a gun at them and fired four or five shots in the officers' direction. Appellant's group fled. Responding police officers discovered Villafana and the other WSW member hiding in a laundry room in an apartment complex. A fully loaded revolver was found in the alley. It had not been fired, and no shell casings were discovered. Officers Mock and Hayes were not wounded, and no bullets struck their vehicle.[4]

On the evening of February 2, 2012, police began searching for defendant in the area of Avalon and Lomita in Wilmington. Late that night defendant appeared at the apartment of WSW member Larry Degroat. He was panicked, and threw two guns, a .38 Smith and Wesson revolver and .9 millimeter pistol, under Degroat's bed. Degroat told him to take them out. Defendant did so, and flushed some empty casings down the toilet. They went to the living room, where defendant asked for a paper and pen. He wrote a note that said: "To whom it may concern this is Topo [defendant's nickname], Westside Wilmas. I'm responsible for everything." He told Degroat that he killed Rodriquez because he was "no

---

[4] Defendant was acquitted of the attempted murder of Officers Mock and Hayes.

5

good and he [was] a snitch." He said that he was tired of living and running from his problems. Degroat believed he was high on meth.

About 45 minutes after defendant arrived, Degroat looked outside and saw that his home was surrounded by police officers. It was now the early morning of February 3, 2012, and the police had decided to conduct a probation search of Degroat's home in an attempt to locate defendant. The police called on Degroat to leave the apartment. He gathered his children and their mother, and did so. Eventually defendant also came out and was arrested.

In a lengthy interview, Degroat told the police about defendant's arrival, his two guns, and his statements. In a search of Degroat's apartment, the police found a .9 millimeter semiautomatic pistol inside a hamper and a loaded .9 millimeter magazine in a lampshade. The police told Degroat that they were unable to find the second gun defendant had brought with him. On February 5, 2012, Degroat returned to his apartment and located the gun under his refrigerator. He told the police, who recovered it (an unloaded .38 caliber blue steel revolver).

*Gang Evidence*

Los Angeles Police Officer Mark Maldonado testified as the prosecution's gang expert. He was familiar with WSW, which had about 450 to 500 members who identified themselves in graffiti and tattoos using common symbols ("WSW," "WS Wilmas," and others), as well as by hand signs (forming a "W"). WSW territory included the scene of the Rodriguez murder. According to Officer Maldonado, WSW's primary activities include, among other crimes, murder, attempted murder, assault with a firearm, and robbery. Officer Maldonado testified concerning the prior first degree murder convictions of two named WSW members in unrelated cases.

6

Officer Maldonado testified that in a process considered "house cleaning" or simple gang politics, a member of WSW will kill another member of the gang who falls out of favor. WSW was affiliated with the Mexican Mafia, which promulgated a rule under which a member who snitches, meaning who talks to the police or testifies against another gang member, can be beaten or killed. Asked a hypothetical question using the evidence of the Rodriguez murder (in which the prosecutor, intending to argue that both defendant and Villafana were shooters, hypothesized two shooters rather than one), Officer Maldonado testified in relevant part that that the crime was committed to benefit the WSW gang. The victim was considered to be a snitch, and to benefit the gang he was killed: "they get rid of the snitch in their house. . . . They don't have to worry about it anymore." Also, "other gangs will hear about it. . . . [T]he gang[']s killing one of their own shows the discipline of that particular gang [and] how violent that gang is." When asked a hypothetical question using the evidence of the Fisher attempted robbery, he opined that it was also committed to benefit the WSW gang.

*Defense Evidence*

Defendant, who was 36 years old at the time of trial, testified in his own defense. He admitted being a member of WSW (as were his parents), having joined when he was 11.

Defendant admitted attempting to rob Fisher. When Fisher took out his wallet when talking to Mona, defendant saw that he had a lot of money. Defendant admitted ordering Fisher at gunpoint to lie on his stomach, firing a shot close to Fisher's head to scare him, and shooting Fisher in the leg while they struggled. He was not able to take any money.

Defendant also admitted killing Rodriguez. When defendant was in prison, a fellow WSW member and close friend was shot and paralyzed. After defendant got out of prison, he discovered in April or May of 2011 that Rodriguez was responsible (although he was not sure if he was the shooter), so he decided to kill Rodriguez. When he learned from Villafana that he was going to Rodriguez's residence to sell some speakers, he texted Rodriguez using Villafana's cell phone in an attempt to lure him into the alley. Villafana did not know defendant's plan to kill Rodriguez.

Defendant convinced Villafana not to go to Rodriguez's residence, and went himself. He was armed with two pistols, a .45 caliber and a .40 caliber. When Rodriguez exited the garage and approached where defendant stood in the alley, defendant started shooting. When the .45 caliber pistol jammed after two or three shots, he used the .40 caliber pistol. Rodriguez ran and fell. Defendant placed the .40 caliber pistol to Rodriguez' head, looked up to make sure no one was around, and fired. Apparently, the bullet ricocheted off the pavement and struck Rodriguez in the head. Defendant denied telling Zamora, Degroat or anyone else that he had committed the murder.

Concerning the shooting involving Officers Mock and Hayes, defendant testified that he started shooting to slow the officers' pursuit. He fired backwards as he fled, and did not shoot at the officers or try to hurt them.

## DISCUSSION

I. *Gang Enhancement*

Defendant contends that the evidence does not support the gang enhancement in the Rodriguez murder count (count 5) and the related count of possession of a firearm by a felon (count 6). Specifically, he contends that the

8

prosecution failed to prove that he committed the crimes to benefit WSW or with the specific intent to promote WSW's gang activities. We disagree. Of course, we view the whole record in the light most favorable to the judgment, and draw all inferences in support. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

As here relevant, the gang enhancement requires that the defendant commit a felony "'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .' [Citation.]" (*People v. Mendez* (2010) 188 Cal.App.4th 47, 56.) Here, defendant told Larry Degroat that he killed Rodriquez because he was "no good" and a "snitch." Officer Maldonado testified in relevant part that that such a crime would benefit the gang to which the snitch belonged because "they get rid of the snitch in their house. . . . They don't have to worry about it anymore." Also, "other gangs will hear about it. . . . [T]he gang[']s killing one of their own shows the discipline of that particular gang [and] how violent that gang is."

From this evidence, the jury could reasonably infer that defendant killed Rodriguez to benefit WSW by ridding the gang of a member who was a snitch. The jury could also infer that he did so with the specific intent to promote WSW's criminal conduct. That is, the jury could infer that defendant, a lifelong WSW member since the age of 11, understood that the murder would demonstrate the violent lengths to which the gang would go to protect itself, thus enhancing the gang's reputation and its ability to carry out its illegal activities without interference. Further, the jury could infer that defendant intended to kill Rodriguez so as to allow his gang to engage in future criminal activity without the risk of having a snitch in their midst who would cooperate with the police.

9

Defendant contends that the prosecution theory was that both Villafana and defendant acted in concert in the killing, and that the hypothetical question the prosecutor asked Officer Maldonado based on the Rodriguez killing assumed that two gang members acted in association in the killing. Because the jury acquitted Villafana of the Rodriguez murder, defendant contends that Officer Maldonado's opinion that the killing of a snitch would benefit the hypothetical gang lacked a foundation. However, Villafana's acquittal has no effect on the sufficiency of the evidence to support the gang enhancement against defendant. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405 [jury verdict or finding inconsistent with another verdict or finding allowed to stand if supported by substantial evidence].) Further, Officer Maldonado's testimony concerning the benefit to a gang by eliminating a snitch was not dependent on there being two shooters acting in concert as opposed to one acting alone – the killing benefits the gang regardless of the number of killers. Moreover, even without expert testimony on the point, the dangers to a gang of having a snitch in its midst are apparent. A jury could rationally infer, as a matter of common sense, that if a life-long gang member such as defendant murders a fellow gang member he believes is a snitch, he does so at least in part to benefit the gang by ridding it of a security risk, and to permit the gang to continue committing crimes without the fear that the snitch will inform on other gang members.

Defendant contends Degroat's testimony is not substantial evidence to conclude that the killing was motivated by the belief that Rodriquez was a snitch. Defendant asserts that he made no similar claim to any other confidant, there was no independent evidence that Rodriguez was considered a snitch, and defendant himself testified that he killed Rodriguez not because he was a snitch, but because he was somehow involved in the shooting of a friend who became paralyzed as a

10

result of his wounds. Of course, absent physical impossibility or inherent improbability, the testimony of a single witness constitutes substantial evidence to support a verdict or finding. (See *People v. Young* (2005) 34 Cal.4th 1149, 1181 [referring to eyewitness identification testimony].) Here, Degroat was a fellow gang member to whose home defendant fled in fear of being apprehended for his crimes, including the murder of Rodriguez. He wrote a note admitting that he was "responsible for everything." In this context, it was neither physically impossible nor inherently improbable that defendant would confess to Degroat his belief that Rodriguez was no good and a snitch. Hence, Degroat's testimony was sufficient to prove defendant possessed such a motivation for killing Rodriguez.

Defendant contends that there was insufficient evidence to prove that he possessed the guns he used to kill Rodriguez to benefit WSW and promote gang activity. However, defendant possessed the guns to carry out the murder of Rodriguez. Thus, his possession of the guns carried the same intent as the killing: to benefit WSW and promote future gang activity by eliminating a snitch. In short, substantial evidence supported the gang enhancement in the murder of Rodriguez (count 5) and the related possession of a firearm by a felon (count 6).

## II. *Sentencing*

Relying on comments made by the trial court at his sentencing hearing, defendant contends that the court demonstrated bias, requiring a remand for resentencing. Defendant forfeited the issue, but, regardless, a remand is not required.

At defendant's sentencing hearing, William Hanoway, a volunteer chaplain at the county jail, spoke on defendant's behalf without being asked to do so. He stated that based on his conversations with defendant, he knew that defendant grew

11

up in a gang environment (his parents were gang members), and he believed that defendant was sorry for his crimes. Hanoway saw "some redemptive value" in defendant and asked "for a little bit of mercy."

A letter from defendant's wife was read into the record. In the letter, she expressed her pride in defendant for "being honest," and stated that while people who did not know defendant may look at him "like an animal," he was not. He was a "loving, big-hearted person." She described him as a loving parent and husband, and asked that the court "remember that he has a wife and kids that love him."

Trina Gomez, apparently defendant's aunt (mother of defendant's cousin), also spoke for him. She stated that she had known him since he was 12. She noted that he had been honest in court concerning his crimes, and she wanted the court to know that defendant "is not an animal," that he had "remorse for certain things that he cannot change," and that "he is human."

Following her statement, the court continued the hearing at defense counsel's request. At the next session, the court asked defense counsel for his "thoughts as to sentencing." Defense counsel replied: "[A]ll I have to say is that I thought during the trial he did a noble act by his testimony where he admitted what he did and exonerated Mr. Villafana. And I think he should get some kind of a break for that."

In response, the court stated: "Frankly, I think he should be stood up against a wall and shot. That's my feeling. And I intend to impose every day that I can. I can't think of a more awful human being."

After hearing from the prosecutor, the court sentenced defendant as a third strike defendant to a total unstayed term of 150 years to life, plus an additional 10 years for his two priors under section 667, subdivision (a)(1), as follows: for the

first degree murder of Rodriguez (count 5), 75 years to life (triple the base term of 25 years to life pursuant to the Three Strikes law), plus an additional 25 years to life for the section 12022.53, subdivision (d) enhancement; for the Fisher attempted robbery, 25 years to life (pursuant to the Three Strikes law), plus an additional 25 years to life for the section 12022.53, subdivision (d) enhancement; on the remaining counts, stayed sentences of 25 years to life; and for the two prior 667, subdivision (a)(1) priors, an additional determinate term of 10 years (5 years each).

Defendant contends that the court's comments that he "should be stood up against a wall and shot," and that "I can't think of a more awful human being," demonstrate a bias in sentencing that requires a remand and resentencing before a different judge.  However, because defendant did not raise the issue of the judge's alleged bias in the trial court, the contention is forfeited.  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1067.)  Even if the issue were not forfeited, however, no remand is required.

The state and federal constitution guarantee a defendant a due process right to an impartial trial judge.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111 (*Guerra*), overruled on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)  However, "[m]ere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias."  (*Guerra, supra*, 37 Cal.4th at p. 1111.)

Here, the trial court's comments were intemperate and ill-advised, but were clearly based on evidence of defendant's violent conduct in the instant case -- his murdering one person execution-style, seriously wounding another in an attempted robbery, and shooting in the direction of pursuing police officers in a third incident.  Although the court's view of defendant's crimes and character should not

13

have been expressed in such inflammatory terms, "[o]n appeal, we assess whether any judicial misconduct or bias was so prejudicial that it deprived defendant of "'a fair, as opposed to a perfect, trial.""" (*Guerra, supra*, 37 Cal.4th at p. 1112.)

As defendant concedes, the only possible discretionary decision involved in his sentencing was whether to strike one or both of his prior strike convictions. The decision to strike a prior strike conviction is subject to "stringent standards that sentencing courts must follow in order to find . . . an exception [to the Three Strikes law]. '[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, "in furtherance of justice" pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'" (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

In the present case, as a matter of law, nothing in the record rationally suggests that defendant should be deemed outside the spirit of the Three Strikes law in whole or in part. Thus, on this record, the trial had no discretion to strike one or more of defendant's prior strikes.

Defendant had been a WSW member since the age of 11. As his probation report shows, by the time of trial, at age 36, he had amassed a long criminal record of theft and violence. He had sustained juvenile petitions for grand theft, intimidating a witness, and murder. He was paroled from the California Youth Authority on the sustained murder petition in October 2001. By March 2002, he

14

had been convicted of carjacking (his first strike offense) and sentenced to three years in state prison. Following his release, he was convicted of robbery in May 2006 (his second strike) and sentenced to six years in prison. Again released, he was convicted in August 2010 of obstructing a peace officer, and in October 2011 of criminal contempt of court. In January 2012, he committed the Fisher attempted robbery, the Rodriguez murder, and fired in the direction of Officers Mock and Hayes who were attempting to apprehend him. Nothing in defendant's prior record or current crimes presented any justification for striking one or both of his prior strikes.

Further, none of the requests for leniency at his sentencing spoke to any true "particulars of his background, character, and prospects" (*Carmony, supra*, 33 Cal.4th at p. 377) that might rationally suggest he was outside the spirit of the Three Strikes scheme in whole or in part. Hanoway, the volunteer chaplain, believed that defendant had remorse and "some redemptive value." According to the letter of defendant's wife (who had been convicted of bribing Fisher), defendant was a loving father and husband, with a family that loved him. Trina Gomez had known defendant since he was a child and believed he felt remorse. Defendant's attorney argued that defendant deserved some leniency because in his testimony he was honest and took the blame for the Rodriguez murder.

But none of these circumstances –notions of remorse, redemptive value as a human being, the love of a wife and children, and testimony absolving Villafana – rationally suggested any mitigation of his past record and current crimes, or any character traits or future prospects indicating his criminal lifestyle was a thing of the past. To the contrary, he was a lifelong, violent criminal who had committed, among other crimes, two murders (one as a juvenile, another as an adult), a carjacking, a robbery, and an attempted robbery. As an adult, he had never

15

remained out of custody for more than three years from one crime to the next.  As a matter of law, regardless of the expressions of love and support he received at his sentencing hearing, he is precisely the kind of recidivist offender that the Three Strikes law was intended to punish.  Thus, despite the court's comments prior to sentencing, defendant was not deprived of a fair sentencing hearing:  the only legally possible leniency that could have been shown was to strike one or both of his prior strike convictions, but on this record the court had no discretion to do so under the stringent standards placed on such a decision.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.

16