Filed 3/2/16  P. v. Jack CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant.<br><br>v.<br><br>CRAIG J. JACK,<br><br>    Defendant and Respondent. | 2d Crim. No. B257030<br>(Super. Ct. No. TA129651)<br>(Los Angeles County) |

Craig J. Jack appeals his conviction by jury of first degree murder (Pen. Code,[1] §§ 187, 189; count 1) and attempted premeditated murder (§§ 664, 187; count 2). As to both counts the jury found that appellant committed the offenses by personally using and discharging a firearm causing death or great bodily injury and that the offenses were committed in association with and to benefit a criminal street gang.  (§§ 12022.53, subds. (b)-(e)(1), 186.22, subd. (b)(1)(C) & (b)(5).)

The trial court denied appellant's motion for new trial and imposed a total prison term of 90 years to life, comprised of 25 years to life for the murder offense plus 25 years for the personal firearm use enhancement as to count 1, and a consecutive term of life with the possibility of parole with a minimum parole eligibility after 15 years

---

[1] All further statutory references are to the Penal Code.

(§ 186, subd. (b)(5)), plus 25 years to life for the personal firearm enhancement as to count 2. Appellant was awarded 310 days of credit for actual time served.

Appellant contends insufficient evidence of identification was presented to support his convictions. We affirm.

FACTS

Appellant is an admitted member of the Grape Street Crips gang (Grape Street). One of the Grape Street's rivals is the Bounty Hunter Blood street gang. Their territories are located about a mile from each other in Los Angeles and are adjacent at points. The hub of the Bounty Hunter Blood territory is the Nickerson Gardens housing project. The hub of the Grape Street territory is the nearby Jordan Downs housing project. The two gangs demonstrate mutual disrespect by robbing and killing one another. Consequently, several surveillance cameras are positioned throughout Nickerson Gardens and Jordan Downs which record and monitor vehicle travel and activities around the clock.

Alicia Gray lived in Jordan Downs, but was friendly with members of both gangs. As a female, she was able to safely travel between the rival gang territories. Appellant was one of Gray's close friends. She met him in 2008 and called him "Fatty." She also knew the shooting victims, Damionye Hubbard, whom she called "Rosco," and Michael Hemphill, who is the father of Gray's cousin Natasha Lee's child. Hubbard and Hemphill belonged to the Bounty Hunter Bloods.

*A. Gray's Rental of Car for Appellant's Use*

In late July or early August 2013, Gray borrowed a car from appellant. When that car was impounded, Gray rented a car on appellant's behalf at the Hertz rental agency near the Los Angeles International Airport (LAX). Appellant selected the car, a 2013 charcoal gray Nissan Altima (2013 Altima) with license plate No. 7ACA334. Appellant paid for it with his credit card, but Gray used her driver's license for the month-long rental. After driving herself home, Gray left the car with appellant. Appellant let Gray use the car a few times for errands, but he usually drove the car. Gray understood, however, that gang members also would be using the car.

2

*B. The Shootings*

At approximately 3:10 a.m. on August 11, 2013, Los Angeles police officers responded to a call of a shooting at the intersection of 112th Street and Central Avenue in Los Angeles. When officers arrived, they observed partygoers shouting and running in the street. In the absence of any reported injuries, the officers left. The shooting was not captured on a surveillance videotape, but the 2013 Altima rented by Gray was photographed travelling northbound on Alvaro Street at 2:58 a.m., about 12 minutes before the shooting was reported. Alvaro Street is in the area of 112th Street and Central Avenue. Police estimate the shots were fired between 2:55 and 3:00 a.m.

The 2013 Altima was observed on surveillance tape driving westbound on 112th Street from Compton Avenue at 4:36 a.m. that same morning. At about 4:38 a.m., Hubbard and Hemphill were seen walking southbound in Nickerson Gardens on Success Avenue toward 114th Street. As shown on the surveillance tape, the 2013 Altima stopped at the intersection of those streets and three males emerged. All three fired gunshots at Hubbard and Hemphill. As Hubbard and Hemphill began to run, Hubbard was struck three times and fell to the ground. According to the medical examiner, Hubbard died immediately from a gunshot wound to his head. Hemphill took three bullets to his right side, but survived. The three males got in the car and drove eastbound on 114th toward Compton Avenue where they turned right and traveled southbound away from the scene. The identities of the suspects could not be determined from the surveillance footage.[2]

Police officers recovered from the scene 44 expended cartridge casings, some .45 caliber and others .9-millimeter. More than 30 bullet strikes were observed on nearby apartment walls. Officers then went to the location of the earlier shooting at Central Avenue where they collected nine additional expended casings, comprised of

---

[2] Detective Charles Hicks was certain the 2013 Altima rented by Gray was the vehicle involved in the shooting because the License Plate Recognition System (LPRS) captured the vehicle license plate entering Nickerson Gardens at 4:36 a.m. and there was a sticker on the rear window captured on the videotape.

both .9-millimeter and .380 caliber cartridges.  Officers believed the two shooting incidents were related.

Gray was visiting her cousin Natasha Lee's unit at Jordan Downs on the evening of August 10, 2013.  She stayed there until about 3:00 or 4:00 a.m. and then walked the block back to her unit.  Shortly thereafter, Lee called and said that her child's father, Hemphill, had been shot.  Gray also learned that Hubbard had been killed.

### C.  Gray and Appellant Return the 2013 Altima and Rent Another Car

A few hours later, on August 11, appellant called Gray about returning the 2013 Altima to the rental agency.  He told Gray they had to take the car back because it had been shot and there were bullet holes in it.  Appellant drove the car to Hertz, where he met Gray.  Gray did not ask appellant about the bullet holes because she generally did not ask questions about such things.  Appellant completed the rental return form, which Gray signed, and Gray rented another car for appellant.  Appellant wrote that "the shooting happened in Hollywood."  When Gray received the second rental car, she drove it around to where appellant was waiting.  Before driving away, appellant told Gray that "if he knew it was [her] cousin's baby daddy, he would have never shot."  He also said, "[I]f they want war, they can get it."

Appellant also told Gray that if she was questioned by police, she should "'say the car was in Hollywood.'"  Gray did not ask questions because "it[']s better not to."  Appellant drove away in the new rental car.  Later, Gray heard rumors that Grape Street was responsible for the fatal shooting.

The next day, August 12, Gray received a call from a friend informing her that the second rental car had been stopped nearby.  Gray walked to the location to retrieve the car and saw that appellant and her cousin Justin Scottleader had been pulled over by the police.  Appellant received a citation for driving on a suspended license.  Gray told the officers it was her rental car, but they impounded it anyway.

### D.  Gray's Interviews with Police

On August 13, police officers informed Gray she could pick up the car at the police station.  When she arrived, she was questioned at length by detectives about

4

the shootings of Hubbard and Hemphill. At first Gray lied because she was scared and did not want to be a "snitch." After she was arrested and booked into jail, she asked to speak again with detectives. This time she told a different version of what happened.

Gray testified that she told the detectives about the first rental car and the shootings because she "didn't want to go to jail for something [she] didn't do." Gray also stated that appellant explained how the three bullet holes got into the car. He said they were driving along, saw the Nickersons (Bounty Hunter Bloods) and then got shot at. Appellant said, "The Nickerson nigga got shot. They want war, they got war."

Gray was promised leniency on her accessory charge (§ 32) in exchange for her honest testimony at trial. The agreement with the prosecution was that, if she testified truthfully, her charges would be reduced to misdemeanor violation of section 148, resisting or obstructing a peace officer.

### E. Fingerprint and DNA Evidence

A forensic fingerprint specialist examined the 2013 Altima. He did not identify any latent prints on the car's interior, but found five latent prints on its exterior. It was determined that four of the prints matched those of Justin Scottleader, Jamell Murray, Denzale Lee and appellant, who, with the exception of Lee, were all Grape Street members.

A DNA analysis was conducted on swabs taken from the 2013 Altima, but no comparison could be made to the DNA profiles obtained from those items. An analysis was also conducted on a cigarette butt found inside the car. The likely source of DNA on the butt was Marquis Anthony Orange, another Grape Street member.

### F. Cell Phone Evidence

An analysis of data for appellant's cellular telephone revealed that between 1:01 a.m. and 3:38 a.m. on August 11, 2013, a large number of calls were made in the vicinity of Jordan Downs. Later calls from the telephone included one at 4:05 a.m. near West 6th Street and one made near the intersection of the 110 and 10 Freeways. At 4:39 a.m., just after the 4:38 a.m. shooting, the telephone was used about 1.13 miles from the site of the shooting. Cellular telephone activity from 4:30 a.m. to 5:17 a.m. showed the

telephone moving away from the shooting location.  Between 4:00 p.m. and 6:00 p.m. the next day, the telephone was used in the area of the Hertz rental car agency at LAX.

### G.  Gang Expert Evidence

When provided with a hypothetical set of circumstances mirroring the prosecution's evidence in this case, the prosecution's gang expert opined that the killing of the victim benefited the shooters' street gang by creating an atmosphere of fear and intimidation within the community they claim as well as with the surrounding gangs. The violence bolstered the gang's reputation, lessening the likelihood that its members will be shot at by rival gang members or that members of the community will call the police or testify against them.  The crimes also benefitted the individual shooters by giving them enhanced status through committing the most violent act possible particularly where, as here, the killing occurred in the center of a rival gang territory. The expert further testified that if the 2013 Altima contained Grape Street members at the time it was the target of gunshots on 112th Street and Central Avenue, either those members or other members of their gang would be expected to retaliate.

DISCUSSION

Appellant contends the identity of appellant as one of the perpetrators of the offenses is insufficient and, as a result, the convictions must be reversed.  The People respond that substantial circumstantial evidence supports the convictions.  We agree with the People.

"Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant [committed the crime] beyond a reasonable doubt.  [Citations.]  The standard of review is the same in cases such as this where the People rely primarily on circumstantial evidence. [Citation.]  'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be

6

convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citation.] (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) "[T]he relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt. . . . [Citations.]" (*Id.* at p. 1127; *People v. Cravens* (2012) 53 Cal.4th 500, 507-508.) In other words, the conviction must be affirmed "'unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'"" (*Cravens*, at p. 508; see *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Appellant correctly observes that the prosecution did not provide any percipient witnesses to the shootings of Hemphill and Hubbard. But that does not undercut the significance of the circumstantial evidence showing that appellant was present at the scene of the shootings, and that he had the motive, means and opportunity to carry them out. Indeed, combined with appellant's admissions to Gray about his involvement in the shootings, the evidence of his guilt is not speculative or merely suspicious, as he claims, but instead rather compelling.

Appellant and the victims were known members of rival street gangs with adjacent territories. Appellant was a Grape Street member, and the victims were Bounty Hunter Bloods. At 2:58 a.m. on August 11, 2013, the 2013 Altima that Gray had rented on appellant's behalf was seen in the immediate vicinity of a shooting reported at 3:10 a.m. at 112th Street and Central Avenue. Nine expended cartridge cases were found in the area. Hours later, appellant informed Gray that the rental car had to be returned because it had bullet holes in it.

At about 4:38 a.m. that same morning, the victims, Hemphill and Hubbard, were seen walking in Nickerson Gardens toward 114th Street. The same 2013 Altima present near the earlier shooting pulled up, three males emerged and all three fired at Hubbard and Hemphill. A reasonable inference from this evidence is that the 2013

7

Altima was struck by bullets during the first shooting, and that Grape Street retaliated by entering Bounty Hunter Bloods territory and shooting two of their members. This evidence is corroborated by Gray's statement that appellant told her that they were driving along, saw the Nickersons (Bounty Hunter Bloods) and then got shot at. Appellant then added, "The Nickerson nigga got shot. They want war, they got war." (See *People v. Williams* (1997) 16 Cal.4th 153, 193 [evidence of defendant's gang affiliation can prove motive and identity].)

Appellant contends this evidence does not prove that he was one of the shooters. Appellant, however, was not simply a random gang member driving the 2013 Altima. The car was specifically rented for his use, and he was seen driving the car around Jordan Downs a number of times before the shootings. The surveillance tape that captured the incident during which Hubbard was killed and Hemphill was wounded showed that the car involved was the same one that appellant had arranged for Gray to rent. Logically, since this was the car that appellant had been using, a reasonable jury could conclude that appellant was one of the perpetrators of the shootings of Hubbard and Hemphill.

Moreover, within hours of the shootings, appellant arranged for Gray to return the rental car. Appellant conceded the car had been shot at, and the fact that appellant arranged for Gray to return the car demonstrates his consciousness of guilt. At the rental agency, appellant filled out the forms explaining the source of the damage, and he told Gray what to say if she was asked about the damage.

The most compelling evidence of appellant's guilt were his admissions to Gray. When Gray brought appellant a replacement for the rental car, he told Gray that he would not have shot if he had known one of the victims was her cousin's "baby daddy," referring to Hemphill. Appellant also told Gray that "if they want a war, they can get it," reflecting his belief that the fatal shooting was a retaliatory act of gang war.

In addition, appellant admitted to Gray that he was driving when the 2013 Altima was hit by bullets and that subsequently one of his gang's rivals had been shot. These admissions, taken together, evidence appellant's percipient knowledge of the

8

precise sequence of events that occurred. They also demonstrate that since appellant was the driver during the first shooting, it may logically be inferred that he was the driver during the shootings that followed.

Furthermore, cellular telephone data indicated that appellant's telephone was near the sites of both shootings at the times that they occurred. Thus, not only did the evidence show that the car appellant had been using was at the scenes of both shootings, but it also showed that appellant's telephone was there as well. This was contrary to appellant's claim that he loaned the car to someone else that night and that he was not the person driving the car used in the fatal shooting.

Appellant argues that Gray's testimony must be disregarded as contradictory, but discrepancies in the testimony are matters to be evaluated by the jury. (*People v. Ford* (1981) 30 Cal.3d 209, 215; *People v. Mendez* (2010) 188 Cal.App.4th 47, 59; *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497; *People v. Taylor* (1955) 136 Cal.App.2d 118, 123.) As appellant points out, the jury asked the trial court during deliberations to read back Gray's testimony regarding the admissions made by appellant at the rental agency following the shootings. That the jury subsequently returned a verdict against appellant strongly suggests that the jurors believed Gray's testimony as to those admissions.

Finally, appellant cites cases in which the evidence, including all reasonable inferences, was enough to raise suspicion but not to prove guilt. In these cases, however, there was limited evidence that the defendants had committed any crimes. (E.g., *People v. Bamber* (1968) 264 Cal.App.2d 625, 632-633; *People v. Briggs* (1967) 255 Cal.App.2d 497; *People v. Jackson* (1965) 238 Cal.App.2d 477.) As we have explained, the entire record here does more than raise a mere suspicion that appellant committed the charged offenses. It was not unreasonable for the jury to find beyond a reasonable doubt that appellant was one of the perpetrators of the shootings of Hubbard and Hemphill.

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

9

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

Paul A. Bacigalupo, Judge

Superior Court County of Los Angeles

_____

Patricia A. Scott for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, David A. Wildman, Deputy Attorney General, for Plaintiff and Respondent.